# Lessee of Stephen Duncan *against* Benjamin Walker.

S. C. 2 Dall. 205.

Pre-emption rights to Indian land under the act of assembly of 21 December 1784, are to be governed by the rules of landed property.

The usage of the late province was to consider improvements, and even warranted and surveyed lands as personal property until 1758, or thereabouts.

EJECTMENT for 300 acres of land, in Pine Creek township, in Northumberland county, within the late Indian purchase.

This cause had been tried at the last May assizes at Sunbury, before M'Kean Chief Justice, and Yeates Justice, when the facts given in evidence appeared as follow:

One Alexander Donaldson settled on the lands in dispute, then within the Indian territory, in 1774, and made an improvement, as it is called, thereon, and continued there some time. Early in 1779, he sold his improvement to William Campbell for 300l. who afterwards worked on the land. Campbell was drowned in Muncey creek in the spring of 1781, and letters of administration were taken out on his estate by James Alexander, on the 14th August 1781, he being one of his creditors. An inventory was taken on the 1st September 1781, appraising the above improvement at 80l. state money, another improvement at 40l. and his personal property at 18l. 15s. On the 3d September following, James Alexander, the administrator, having advertised the premises for sale at least ten days, (but without any order of the Orphans' Court,) proceeded to sell the same by public vendue, in the town of Northumberland, and at a fair and open sale, sold the same to John Walker for 150l. and conveyed the same to him by deed poll of that date, with covenant of warranty.

John Walker was shortly afterwards killed by the Indians. On the 13th September 1782, letters of administration issued on his estate to Jane Walker and Benjamin Walker, who, on the 3d March 1785, conveyed the premises as administrators to William Walker, in consideration of 63l. 10s.; who, on the same day, reconveys it to the said Benjamin Walker, the defendant, in consideration of 65l. 10s.

On the 5th June 1785, Robert Campbell, brother and heir at law of William Campbell aforesaid, conveyed to Stephen Duncan, the lessor of the plaintiff, the lands in question, in consideration of 25l. who, on the 29th day of the same month, *214] took out a war*rant for the premises, reciting the first settlement of the land, the sale to William Campbell aforesaid, and the conveyance of his heir at law to said Duncan.

On the 20th October 1785, the same Benjamin Walker also takes out a warrant for these lands.

[Duncan *v.* Walker.]

On the 11th November 1785, a survey is made containing 324 acres; and on the 1st November 1786, Duncan enters a caveat against the acceptance of Walker's survey or granting him a patent.

In the interim, on the 26th September 1786, James Alexander settles his administration account on the estate of William Campbell, in the register's office of Northumberland county, wherein he charges himself with the amount of sales of the improvements contained in the inventory, and the personal estate, . . . . . . . . . . . . . . . £279
and credits himself with several sums amounting to 84 15 11

Balance remaining in his hands. . . . . £194 4 1

On these facts two exceptions were taken to the title of the defendant:

1st. That James Alexander, the administrator of William Campbell could not, consistently with the laws or usages of this state, sell this improvement without being empowered so to do, by an order of the Orphans' Court.

2d. That no right to the improvement attached until the 21st December 1784, when the law passed, amending the act of assembly for opening the land office, and consequently could not legally be transferred.

It was admitted by the plaintiff's counsel, that should he recover in the suit, these lands were liable to the debts of William Campbell deceased, in case of a deficiency of personal assets.

It was at length agreed, that the jury should find a verdict for the plaintiff, subject to the opinion of the court in bank, on the point reserved: whether the lands in question sold by James Alexander as administrator of William Campbell, were to be considered as governed by the rules of real or personal property? If the court on argument, should be of the former opinion, then judgment to be entered for the plaintiff; if otherwise, judgment to be entered for the defendant.

The point reserved came now to be argued by Mr. Ingersoll for the plaintiff, and Mr. Lewis for the defendant.

*On the part of the plaintiff it was urged, that this [*215 pre-emption right could be considered in no other light than real estate. The words of the act of 21st December 1784, § 10, (Loose Acts, p. 411) are, "all and every person or "persons and their legal representatives, who has or have "heretofore settled on the north side of the west branch of "the river Susquehannah, &c. shall be allowed a right of "pre-emption to their respective possessions, at the price "aforesaid." The question then is, whom do the words "legal representatives" designate?

By the act of assembly passed February 18, 1769, (Hall and

[Duncan *v.* Walker.]

Sellers's edit. 696,) all persons who shall presume to settle on lands not purchased of the Indians, being legally convicted thereof, shall forfeit for every offence the sum of 500l., suffer twelve months imprisonment, and find security for his good behaviour for twelve months after the expiration of his imprisonment.

Under this law, therefore, the persons who have made such settlements on the Indian lands, must be considered as trespassers, until the act of 1784, which declares that such persons have "by their resolute stand and sufferings during the "late war merited a pre-emption to their respective possessions."

We contend that "legal representatives" refer to heirs, the subject matter being lands, and that they cannot relate to executors or administrators.

Lands, *ex vi termini*, mean estates of inheritance.    2 Black. Com. 16.    At common law, previous to the statute of 32 Hen. 8, c. 37, if the lessor who had reserved rent service had died, and there had been rent arrear, neither his heir nor executor could maintain an action of debt for them.    Not the heir, because he had nothing to do with the personal contracts of his ancestor; nor the executor, because he could not represent his testator as to any contracts relating to the freehold and inheritance.    2 Bac. Abr. 16.    Co. Lit. 162, a.    No executors can succeed to a freehold.    2 Black. Com. 259. Where an estate is to vest on condition of payment of money, and the ancestor dies, the heir may perform the condition, and shall have the estate.    Ambl. 179.    1 Equ. Cas. Abr. 106, pl. 6.    Conditions and covenants real shall descend to the heir, and he alone shall take advantage of them; and this not only where there are express words, but where there are none.    3 Bac. Abr. 20.    Where executors or administrators are described, they are called personal representatives.    2 Bl. Com. 158.    Where they are contrasted with heirs, heirs are called real representatives.    3 Atky. 685.    Chaloner *v.* Butcher cited.    Descent or hereditary succession, is the title whereby a man on the death of his ancestor, acquires his estate by right of *representation, as his heir at law.    2 Black. Com. 201.    And the words "heirs," "successors" or "representatives" are used as synonimous and indiscriminately in the same book, pa. 11, 103, 155, 202, 210, 216, 217, 224.

In our own municipal laws, the same thing fully appears. Under the act passed 3d December 1782, vesting the residuary real estate of John Nicholas in trustees, with power to sell the same, the trustees are directed to calculate the shares which each of the residuary devisees of the·said John under his will and the representatives or children of such devisees are entitled to.    § 6, Loose Acts, p. 125.

So in the title of the act, p. 123, it is said "to make dis "tribution of the money arising by these sales among the

[Duncan v. Walker.]

" residuary devisees of the said John Nicholas, and their legal "representatives," &c.

Under the act of 12th March 1783, for selling certain lands for the purpose of paying off the certificates of depreciation given to the officers and soldiers of the Pennsylvania line, and appropriating the donation lands for the use of the said officers and soldiers, it is directed, pa. 137, § 7, that the officers and privates, their heirs, executors and administrators, shall make application to the land office within certain limited times.   It is the usage of the land office to grant, on such applications of the executors or administrators, warrants to them in trust only for the devisees or heirs at law of such person so entitled.

And under the supplement to the several acts for distributing the donation lands promised to the troops of this state, passed April 6th, 1792, (Loose Acts, p. 239) it is directed, in the second section, that upon the application of any person thus entitled to said lands, "or his legal representative," to the surveyor general, within two years after the passing of the act, patents shall thereupon issue in the usual form.   The usage of the land office has uniformly been under this law, to grant patents, where the officer or private has died, to their devisees or heirs at law, or to their executors or administrators, in trust for their use.

The act of 4th April 1792, (Loose Acts, p. 217) vests in certain trustees all the residue of Christopher Sower's forfeited estates undisposed of on the public account, in trust for the legal representatives of the said Sower, &c.

In the act to enable executors or administrators, by leave of court, to convey lands contracted for with their decedent, passed 31st March 1792, (Loose Acts, p. 198) the word "re-"presentatives" in the first and second sections, is considered as synonimous with vendees, devisees and heirs at law.

Pre-emption rights to Indian lands are founded solely on the *act of assembly of 21st December 1784.   They had not originally the first features of improvements, nor were entitled to any favour; they were highly criminal in the eye of the law.                                         [*217

In most of the western counties, real *bonâ fide* improvements on lands purchased from the Indians, which interfered with no adverse legal right, were considered by the general usage of the .proprietary officers and country, as giving a preference to the lands settled, provided they were duly followed up.

Antiently they were considered as a kind of chattel interests, and were sold by executors or administrators as personal assets, in a great variety of instances.   But this practice has subsided for thirty-five or forty years past, and the invariable usage since, has been for the administrators to apply to the Orphans' Court for an order, empowering them to sell such

improvements.  This has not been done in the present in-
stance, and therefore if William Campbell's claim is to be
taken as an improvement, at the time of his being drowned
in 1781, the title is not divested out of his heir, for want of
this necessary pre-requisite.

If pre-emption rights are considered as governed by the
rules of personal property, will it not be an introduction of a
novelty into the law?  Will not the widow be stripped of her
dower?  Will a husband be tenant by the courtesy?  Will
not the children of the half blood succeed to the lands, equally
with those of the full blood?  These are some of the certain
inconveniences which must necessarily result from the system
insisted on by the defendant.

On the part of the defendant, it was contended, that the
words "representatives," or "legal representatives," were
equivocal in themselves, and might fairly be referred to either
real or personal property, where the subjects were of a de-
scendible quality.  Most of the cases and laws cited, on in-
spection, prove this.  To distinguish executors from heirs,
they are called in 3 Atky. 685, "personal representatives,"
and the latter, "real representatives."  If the executor, be-
fore the stat. of 32 Hen. 8, c. 37, could not maintain debt for
arrears of rent-service reserved by the ancestor, neither could
the heir.  2 Bac. Abr. 16.  Neither executor nor heir *quoad
hoc* represented the ancestor.

In the act of 3d December 1782, respecting the residuary
estate of John Nicholas, the money arising upon the sales of
the houses and lots was to be paid to the devisees, and the
representatives or children of such devisees, &c.

So in the act of 4th April 1792, respecting the residue of
Christopher Sower's forfeited estate, the words "legal repre-
sentatives," are expressly referred to both real and
personal estate.

But what sets this matter beyond all question, are the words
of the acts of assembly of 4 Annæ and 4 Geo. 3.  In the for-
mer, passed in 1705, for the better settling of intestate's es-
tates, § 1, pa. 23, the Orphans' Courts are to make distribution
of the balance of the personal estate among the wife and
children, or children's children, (if any such be,) or otherwise
to the next of kindred of the dead person in equal degree,
"legally representing" their stocks.  And in fixing the mode
of distribution of the personal estate, (§ 2,) it directs two-
thirds thereof to go to the children of the intestate, and to
such persons as "legally represent" such children: and in
case there be no children, nor "legal representatives" of
them, one moiety of the personal estate is allotted to the wife,
and the residue to the next of kindred of the intestate, who
are in equal degree, and those who "legally represent" them.

In the supplement to this act, 4 Geo. 3, passed 23d March
1764, § 1, pa. 307, the word "representatives" is referred to

[Duncan v. Walker.]

both real and personal estate; and in the same section, "legal "representatives" refer expressly to personal estate. In the 4th section of the same act, "representatives" relate to the dividend arising to each child out of the one-third of the amount of the valuation reserved to pay the widow's dower.

It may therefore fairly be concluded, that the words "legal "representatives" may relate to any subjects of a descendible quality, to an estate of freehold or a term for years in lands, to either real or personal property. As the case may be, they may refer to heirs when the subject matter is freehold, to "executors" or "administrators" when it is of a less estate.

The act of 18th February 1769, certainly operated as a bar to persons claiming lands under settlements on the Indian lands; but the act of 21st December 1784 removes that bar, and operates retrospectively. The defendant had a portion of merit, by his stand and sufferings after his purchase in 1781, which was contemplated by the legislature.

It is true, the sale by James Alexander, as administrator of William Campbell, was without any order of Orphans' Court. But considering the claim at that time as an improvement, it is within the spirit of the cases, Burger's lessee v. Trexel, tried at Nisi Prius at Easton, and Eip's lessee v. Marat, tried at Nisi Prius at Lancaster, before the revolution; where, in both instances, sales by administrators of improvements, without any orders of Orphans' Court, were sanctified by the decisions of the *courts and juries. It would now be [*219 dangerous to shake those determinations on which many titles depend.

It is material to consider the view, in which the legislature contemplated these pre-emption rights, at the time of passing the law of 1784. They could not be deemed legal estates in any shape, either before or after the passing of the act. Persons, who had settled on the Indian territory previous to 1780, and continued thereon during the war, were allowed a right of pre-emption to their respective possessions, provided they applied for the same, and tendered the consideration to the receiver general of the land office before the 1st November 1785. It could not therefore be regarded as a right of inheritance, but it was a mere privilege to purchase; it was not a descendible right to the heir. Until application for the warrant, and the money paid or tendered, no legal estate vested. It was an imperfect right, which, by being pursued up, as the law directed, would vest the wife with the right of dower, would entitle the husband to hold by the courtesy, and would exclude the half blood from taking as heir by descent to the person last seized; it would, in short, then for the first time, become a legal real estate.

Mr. Charles Smith was beginning to reply on the part of the plaintiff, but was stopped by the court.

[Duncan v. Walker.]

And afterwards, this term, the chief justice delivered the opinion of the court.

The question is, whether under all the circumstances of this case, as reported, the lands in question are to be considered as governed by the rules of real or personal property? The solution thereof depends on the true construction of the 8th and 9th sections of the act of the 21st December 1784, the decisions of courts of justice on inchoate rights and claims, and the usage of the land office.

It is not easy to denominate the species of property, (if it may be properly termed such) which the settlement of these lands gave in the first instance. A right of improvement it could not be called. It was a wrongful act in despite of positive law, which inflicted for the offence a penalty of 500l., one year's imprisonment, and a binding to the good behaviour for one year afterwards. According to the opinion of the court, delivered in the case of the lessee of John Hughes v. Henry Dougherty, tried at Sunbury, October assizes 1791, "It was an offence that tended to involve the country in "blood; but the merit and sufferings of the actual settlers "cancelled the offence; and the legislature mindful of their *220] "situation, provided this special act * for their relief. "The preamble of the act of 1784 recites their resolute "stand and sufferings, as deserving a right of pre-emption."

If the retrospective words of the act, are thought to dignify this as an improvement, considered as referable to the year 1781, the proper system has not been adopted in this case to enable the administrator to sell the property. Improvements made *animo residendi*, and even warranted and surveyed lands, thirty-five years ago, or thereabouts, were generally considered as mere chattel interests, and appraised as such in inventories of deceased persons; they were sold in the common course of administration, by executors or administrators as mere personal property, and such sales when made fairly for the purpose of payment of debts, or bringing up minor children (though even by executors *de son tort*) have been sanctioned by frequent decisions in courts of justice before the revolution. The same point occurred to us at Lancaster, June assizes 1782, in the case of the lessee of Robert Means and Grizel Litle v. Joseph Flora, sen. and jun., and a determination of the same kind took place, though the lands in question had been first settled under a license from James Logan, one of the commissioners of the land office. This was formerly the general usage and practice of the country; but it has been discontinued about 34 or 35 years, and the uniform system has been since, in the case of an intestacy, for the administrators to apply to the Orphans' Courts for an order empowering them to sell the improvement, or warranted and surveyed lands. In this point of view, the defendant's title is evidently defective.

[Duncan v. Walker.]

The words "legal representatives" contained in the law, are equivocal in themselves, as has been abundantly shewn by the defendant's counsel, and may be referrible either to "heirs," "executors," or "administrators," according to the subject matter.    As they relate to lands in this instance, we apprehend the words are to be considered as referring to "heirs," and that this was the meaning of the legislature, though the right was at first inchoate and imperfect.    When a person dies possessed of an improvement right, it now descends, (such as it is) on his heirs; so of lands warranted and surveyed.    And the determinations of courts of justice have accorded therewith.

The practice of the land office also concurs, when the original improver, or taker up of the land has died, before the patent issued.    The patent is invariably made to the heirs of the decedent, or in trust for their use, or the devisees, abstracted from the usage before alluded to, which has been discontinued so many years ago.

*Upon the whole, we think that the title to the lands [*221 in question must be governed by the rules of real property, and that judgment be entered for the plaintiff.

Explained in 6 S. & R.. 82.
Cited in 7 S. & R., 406, in support of the proposition that the words legal representatives may be referable either to heirs, executors or administrators, according to the subject matter, and when they relate to lands, they are always considered as referring to heirs.
Cited also in 2 Yeates, 125, 169, 588; and in 7 Watts, 255.