## Graham *versus* Graham's Executors.

The parol contract of a decedent, to give the plaintiff a certain portion of his estate, in consideration of services rendered, even if capable of being enforced, can only be, when clearly proved, by direct and positive evidence, and when its terms are definite and certain.

A promise to give the plaintiff, in consideration of services, " as much as to any relation on earth," is too indefinite, to be enforced against the executors of the promissor.

The measure of damages, in an action for the breach of such promise, is the value of the services rendered, and not the proportion of the decedent's estate promised to be given.

ERROR to the District Court of *Allegheny county.*

This was an action of *assumpsit* by Jane Graham against Allen Kramer and D. N. White, executors of William R. Graham, deceased, with notice to his widow and heirs, to recover damages for the breach of an alleged parol contract by the decedent, to give her, in consideration of services rendered, a portion of his estate, at his decease.

On the trial of the cause, the plaintiff gave the following testimony.

*Elizabeth Graham, sworn.*—" I am mother of the plaintiff; my husband's name was Robert; he died in 1848; I had five children at his death; Jane is the eldest of the plaintiffs. I was somewhat acquainted with William R. Graham, deceased;

my husband was a nephew of his; he resided out on the Franklin Road. Wm. R. Graham was never in my house but once; he had called at the door at one time before that; he came to get the girls. He said, he wanted Eliza to wait on aunt—that was his wife; he said, he wanted Jane to see to the kitchen, and attend to the household affairs. He came in a carriage; Henry Kountz came with him. When he came in, he said, that he had come to make choice of these two girls, Jane and Eliza; he said he had three coloured girls, and one was free on the 1st of April, and the other one had three or four years to serve, but she had set the house on fire, and he could not keep her any longer. Jane was not there; she was at Hay's, and I told him I did not think he could get Jane. Then he turned round, and said for me to send for Jane, and I sent for Jane; he was standing up at this time, and said he would not take a seat until he knew whether he could get them. He said, if they would go with him, he would give them, at his death, *as much as any relation he had on earth.* He told this to me and Eliza, when he first came in; he said, if Eliza and Jane would go with him, *he would give them as much as any relation he had on earth.* Jane came in immediately after I sent for her; she was living handy, with Mrs. Hay. When Jane came in, he told Jane the same thing that he had Eliza— '*that if they would go and live with him till his death, he would give her as much as any relation he had on earth.*' Jane did not consent, till she sent for Mrs. Hay, to see what she would say; Mrs. Hay came right then; then uncle set down and told Mrs. Hay that he had come for the two girls. Well, he said, he understood that one of them was hired with her, and then he asked her advice about it, and she was not very willing to give up Jane, and then he told her what he was going to do; that he was going to make them as well off as any relation he had on earth, at his death. Mrs. Hay then said, that he could do more for them than she could, and she gave up the girl. The girls went to go right away with him, and they went; he had dinner before they went. They just packed their trunk, and went immediately after dinner. Henry Kountz fetched the old gentleman to the door, and then took the horses to the stable; he eat dinner with us; he was not a great while gone; he took the horses out of the carriage. I was keeping boarding-house at the time; Eliza was at home; my oldest daughter was delicate, and Eliza was the only help I had; she was able to help, wash dishes, &c. Jane was getting $1.25 per week at Mrs. Hay's. He told me that, if they were not good girls, if they did not please him, he would return them to me; he did not say, whether he would give them any thing or not, in that event. This was in March 1850, that he came for the girls. They were there about three months or more before I saw the girls; I saw them at 'Uncle Billy's' own house; the girls

[Graham *v.* Graham's Executors.]

were doing the work of the house. Uncle was an old man, but I don't remember his age; he was a big stout man when he came for the girls; I believe he was in as good health as he had been. The old lady was not able to do anything when I went out there; she was in her arm-chair; she had the rheumatism. He told Eliza that he wanted her to dress and undress aunt, and attend to her altogether, and Eliza did attend to her; she was not able to help herself. He farmed; he had a good many hirelings; the house was very large; they had a great deal of company. At the time the arrangement for the girls was made, Mrs. Hay, Mrs. Hirst, and Mrs. Bassett were there; Mrs. Hay has gone to California; Mrs. Bassett is dead; I don't know where Mrs. Hirst is; she moved back of Cincinnati, I heard some one say. When I went to the old gentleman, he told me he was well pleased with the girls; he seemed to think a great deal of them; there was no complaints. I was not out again till his funeral. He gave me betwixt $10 and $12 the first time, and he told me what to get with it—clothes for the girls; the next time he gave me $15; this he sent to me, and sent a note containing a list of the articles which I was to get for the girls—black frocks, stuff to make skirts, and anything else for the fall of the year; the black dresses for Sunday; I got everything he sent for, *and what money it wanted, I put to it.* I did not see the girls again until his death, I believe about the 20th of October; they remained there for two weeks or ten days after his death; they came home to me; one went to live with a Methodist preacher, and one went to live with my sister; aunt gave them $3 apiece when they left; she told them to buy capes or shawls with it; uncle had no family but himself and the old lady; *his nearest relations were nephews.* He took the girls to church; sometimes one and sometimes both."

*Samuel Graham, sworn.*—" I know the parties to this suit, and Wm. R. Graham; he was an uncle of mine; he lived out the Franklin Road; I generally went out once a year to visit him, for the last twenty years, before he died. I was there in June 1850; last time I saw him till he died; about the 19th or 20th of October he died. He asked me if I knew that two of my brother Robert's daughters were living with him at this time; told him I knew nothing about it; he said he had two of them; *had hard work to get them;* when he went after them, the mother was keeping boarders, and one of them lived with her, the other was living away from home with Mrs. Hay, assisting her to take care of her children until Mr. Hay would come back from California; with some coaxing, he got consent of the one that was living with her mother to go and live with him. He said one was not enough unless he could get two of them; the other was living with Mrs. Hay at the time; he got one of the inmates to go after her, and

[Graham *v.* Graham's Executors.]

bring her in to him, that he could see her; she was brought in immediately; he asked her, if she had any objection against going along with him; she had no objections, but she did not think Mrs. Hay would let her off; he said he would not take her, on any consideration, unless Mrs. Hay would agree; he told her to go back and bring Mrs. Hay, until he could see her, and she brought her in immediately, and he was introduced to her as Mrs. Hay, by some one in the house; he did not know who. He said, to know the short and the long of it, he broached the subject to her pretty soon; says he, 'Mrs. Hay, I have come after two of these girls of Robert Graham's to go and live with me, and you have got one of the ones that I want;' Mrs. Hay replied, 'will not one of them do you, Mr. Graham?' 'No,' says Mr. Graham, 'I want one to assist my wife to help her to fold her clothes, night and morning, off and on; for she is so helpless with pains she cannot do it herself; the other I want to do house and kitchen work.' Mrs. Hay then stated, 'I don't see how I can do without her, as I have no one to assist me in taking care of my children.' My uncle then said he saw it was likely to be *bilious;* that he would have to speak to the point; says he, 'Mrs. Hay, don't you know that I am an uncle to these girls' father; that I can do more for them, and will do more for them than any stranger can or will?' Mrs. Hay stated then, 'that I know you can, if you are a mind to; for all I can do for the girl is to give her her wages.' My uncle then stated, 'I can do more than that—*if they stay with me and behave themselves, and does what is right, I shall give them a share with all my nephews, that is of my own blood and flesh, at my last.'* Mrs. Hay then said, that she had better let her go, and do the best she could for herself; she could not do that; my uncle said that he was glad to hear the word 'Go;' he got them ready as soon as he could; got their clothes gathered up, and got them in the carriage and started. I told him I did not think it was worth while to give them anything; he asked me the reason why; I told him they were both young, and they would likely spend it all, and it would do them no good; he told me he could fix that, and he would fix it. If he left it *in money* to them, he would have it put out in some good man's hands on interest, that would see them righted when they became of age; and if he left it *in land property*, he would have it rented out in some good man's hands; he said they should not handle a dime of it till they became of age. I asked him how old they would have to be before they could lift real estate, and he said twenty-one years and one day; he stated to me, that he wished I should remember what he had said; that there should be no hard feelings if he should have to turn them off with common wages. The conversation ceased at that time, so far as I recollect. He said, he would give them a share with all (his) my nephews, that is, of my

[Graham v. Graham's Executors.]

own blood and flesh, if they stayed with him and behaved themselves. 'If they don't do that,' says my uncle, 'I shall pay them off with common wages, and will discharge them, and will have nothing more to do with them, nor one of the family, so long as *oak* and *ash* grows;' that is all I recollect. He spoke of being pleased with them at that time; this was about the first or second Thursday in June; I was not out there again until the old gentleman was dead."

The plaintiff then offered to prove the value of the testator's estate, and the shares thereof taken by his nephews, under his will, for the purpose of showing the measure of her damages. To this offer, the defendants objected, on the ground that the measure of damages was the value of the services rendered, and was not to be governed by the amount of the testator's estate. The court below (WILLIAMS, J.), overruled the offer, and gave the following opinion:

" The objection to the offer, for the reasons assigned, raises the main question in these cases, and that is, what is the measure of damages for the breach of the alleged contract, supposing the jury to find the contract to be as stated, either by Elizabeth Graham or by Samuel Graham. This question can be as well determined at this, as at any subsequent stage of the trial, and it may save time to rule it now. The contract sued on here, is not like that in Bash v. Bash, 9 *Barr* 260; and in McDowell v. Oyer, 9 *Harris* 417, to which it has been likened; there the contract was to convey a specific piece or tract of land in consideration of the plaintiff's services; here there is nothing specific or definite —all is vague and uncertain; it does not appear that the testator had anything specific or definite in his mind, when he made the alleged promise, or that the plaintiffs had any definite idea or understanding of the amount of the compensation promised. The testator did not intimate what or how much he would give to ' *any relative he had on earth*,' or what share of his estate he would give to his ' *nephews of his own blood and flesh, at his last.*' The promise as stated by either of the witnesses is vague and uncertain, and is wanting in the essential elements of a valid contract. But the plaintiffs having performed the services, and having been disappointed, are not altogether without remedy; they are entitled to a reasonable compensation for the services. If they cannot have specific performance of the promise, or such damages as would be equivalent thereto, they are entitled to such damages as will fully compensate them for all the services actually rendered. This is the view taken of the question when these causes were before this court on a former trial, and as I am inclined to the same opinion still, and should be disposed to instruct the jury *that the proper rule or measure of damages is the value of the plaintiffs' services*, it is not worth while to take up

[Graham v. Graham's Executors.]

time in hearing evidence that can throw no light on this question. Under the ruling in Sylvester's Case, cited with apparent approbation by DUNCAN, J., in Shuman v. Kittsmiller, 17 *Serg. & Rawle* 48, there may be some doubt, whether the plaintiffs are not entitled to the full measure of damages claimed; still, as I cannot find, that the rule there laid down has been followed in any case like the present, but, on the contrary, the value of the services in such cases *have only been recovered*, and as this measure of damage seems to be the better rule—more in accordance with principle and sound reason—I feel warranted in adopting it, and excluding the evidence proposed to be given. The plaintiff's offer is therefore overruled."

To this opinion the plaintiff excepted; and a verdict and judgment having been rendered for the plaintiff for $296, she removed the cause to this court and here assigned the same for error.

The like proceedings were had in a suit by Eliza Graham against the same defendants; both causes were tried together, and it was agreed, that both should be settled by the judgment of the court upon the present writ of error.

*A. M. Watson*, for the plaintiff in error.—The contract is sufficiently certain to support an action: Sherman v. Kittsmiller, 17 *S. & R.* 48; Sylvester's Case, *Popham* 148; 2 *Roll. Rep.* 104; Johnson v. Hubbell, 5 *Am. L. R.* 177; Jack v. McKee, 9 *Barr* 240; Randall v. Willis, 5 *Ves. Jr.* 462; Jones v. Martin, *Id.* 265 note.

The doctrine of Jack v. McKee was recognised long before that decision was pronounced—*it is by no means new*: Graham v. Bickham, 4 *Dall.* 149; Ewing v. Tees, 1 *Binn.* 450; Sherman v. Kittsmiller, 17 *S. & R.* 48; Rohr v. Kindt, 3 *W. & S.* 564; Bash v. Bash, 9 *Barr* 260; McDowell v. Oyer, 9 *Harris* 417; Beach v. McClintock, decided at Philadelphia in May 1854; Malaun's Administrator v. Ammon, *Grant's Cas.* 123; Burlingame v. Burlingame, 7 *Cowen* 92; Hopkins v. Lee, 6 *Wheat.* 109.

*Roberts & Mellon*, for the defendants in error, cited Sumner v. Williams, 8 *Mass.* 178; 1 *Parsons on Contracts* 399; Altham's Case, 8 *Rep.* 155 a; Webb's Case, *Roll. Abr.*; Lees v. Whitcomb, 5 *Bingh.* 34; 2 *Parsons on Contracts* 78; Peck v. Halsey, 2 *P. Wms.* 387; Jubber v. Jubber, 9 *Sim.* 503; *Year Book*, Edw. III. p. 49; Winter v. Perratt, 9 *Cl. & Fin.* 688.

The opinion of the court was delivered by

STRONG, J.—The temptation to set up claims against the estates of decedents, particularly such decedents as have left no lineal heirs, is very great. It cannot be doubted, that many such claims have been asserted, which would never have been known, had it

[Graham v. Graham's Executors.]

been possible for the decedent to meet his alleged creditor in a court of justice. Not unfrequently, we witness a scramble for a dead man's effects, disreputable to those engaged in it, and shocking to the moral sense of the community. Such claims are always dangerous, and, when they rest upon parol evidence, they should be strictly scanned. Especially, when an attempt is made, under cover of a parol contract, to effect a distribution different from that which the law makes, or that which the decedent has directed by his will, should it meet with no favour in a court of law. Even if any such contract may be enforced, it can only be, when it is clearly proved, by direct and positive testimony, and when its terms are definite and certain. The danger attendant upon the assertion of such claims requires, as was said by Chief Justice GIBSON, in reference to a somewhat similar contract, that "a tight rein should be held over them, by making the quality, if not the sum, of the proof a subject of inspection and governance by the court, and by holding juries strictly to the rule prescribed."

In the present case, the alleged contract is attempted to be proved by the testimony of two witnesses—the mother, and the uncle of the plaintiff. The mother speaks of what took place between the parties, and the uncle details the account which the decedent himself gave of the arrangement. "But neither so does their witness agree together." The mother testifies that the defendants' testator desired the two girls, Jane and Eliza, to go and live with him, and that he said to them individually, "that if they would go and live with him till his death, he would give her (each of them) as much as any relation he had on earth." The uncle details a conversation between himself and William R. Graham, the defendants' testator, in which Graham gave an account of the arrangement he had made respecting the girls. He, said, that he had told Mrs. Hay, that he could do more for them than give them wages; he added, "if they stay with me, and do what is right, I shall give them a share with all my nephews that is of my flesh and blood, at the last;" he said, he had not determined, whether to give it in land or money; that the girls should not have a dime until they became of age, and he desired the witness to remember what he had said, so that there might be no hard feelings, if he should have to turn them (the girls) off with common wages. So far is this testimony from amounting to clear, direct, and positive proof of a contract, definite and certain, that it leaves it extremely doubtful whether any contract was intended; whether anything more was held out or understood, than encouragement to expect a legacy. The testimony of the uncle proves no contract at all, only a testamentary intention; the witness did not understand it as more, for he states that he advised to give the girls nothing, and adds that the decedent said, if the girls did not stay with him, and behave themselves, he would give them

nothing, nor one of the family, so long as oak and ash grows, but would pay them off with common wages, and discharge them, and have nothing more to do with them. The testimony of the mother is very little better.

But, at all events, the contract, if any, is too uncertain to admit of enforcement. How much did the decedent promise to give? The amount is uncertain, and, from the nature of the arrangement, is incapable of being rendered certain. The plaintiff in error relies on Sylvester's Case, *Popham* 148, and 2 *Roll. Rep.* 104, and that does bear very considerable resemblance to the present. It was decided at Trinity Term, in the 17th year of James 1st, before the statute of wills of Charles 2d, William and Mary, and Queen Anne's reigns. There the promise was to give with a daughter a child's part, and at the promissor's death, as much as to any of his children, excepting his eldest son; the plaintiff showed, that the promissor had not given a child's part, and that a younger son of the promissor had £100 given him; it was resolved, that "the promise of a child's part was altogether uncertain, but being so much as any of his children had, and then showing that the younger son had £100 was certain enough, and therefore judgment was given for the plaintiff." Here it will be observed, that a designation of the amount promised by the term "child's part" was held to be uncertain, though a reference to what might be given to a younger child was treated as sufficiently definite. But I do not find that the precise principle of this case has ever since been recognised. It is difficult to conceive of anything more indefinite than a promise to give as much as to any relation on earth.

But without pressing the insufficiency of the proof of the contract, even if it were definite and certain, it by no means follows that the measure of damages, in an action for its breach, is the value of the thing promised at the time of the breach. Jack *v.* McKee, 9 *Barr* 240, is no longer a rule; this court has returned from the departure which was made in that case. That was an evasion of the statute of frauds. It was giving to a parol agreement for an assurance of lands, all the effect which attends a written contract, and even more, for in a suit for the breach of a written contract to convey lands, the plaintiff was never allowed to recover the value of the land at the time of the breach of the contract. The measure of damages, even for the breach of a covenant of seisin, or for quiet enjoyment, is the consideration paid.

This case, indeed, is not affected by the statute of frauds, but if the measure of damages must be what is contended for by the plaintiff, what less is the result than the establishment of a parol will? Is it not a posthumous disposition of William R. Graham's estate? If he could thus dispose of a part of his estate, why not of all? Suppose that, in consideration of their living with him until his death, he had verbally promised one-half of his estate to Jane, and the

[Graham *v.* Graham's Executors.]

other half to Eliza; if, in an action for a breach of the promise, each may recover the value of one-half of the estate, then the verbal agreement would be, to all intents and purposes, a will. It is a palpable error to say, that the damages are to be regarded as a debt or liability of the estate. They are a distributive share, and are claimed and recovered as an equivalent for an inherited portion or a legacy. If they are the fruit of a legal liability of the decedent, then the rule which the plaintiff invokes, leads to a still greater absurdity, than even a parol will; for, under the contract which she sets up, she is only entitled to a share of what remains, after all legal liabilities are discharged, and if those liabilities absorb the whole estate, she is entitled to nothing. The extent of her right varies with the residuum of the estate; and is incapable of measurement until the residuum be ascertained; there is no possible meter for it.

It follows from these observations, that the District Court was right in rejecting the evidence offered, and the judgment must be affirmed.

Judgment affirmed.