# Walls' Appeal.

1. The parol promise of a decedent to the mother of his niece, that if she would let his niece stay with him and his wife she, the niece, should have a good home as long as he lived, and at his death he would provide for her; that she should never want as long as she lived—if a contract, is not capable of being enforced because its terms are hopelessly indefinite and uncertain as to length and amount of service, as well as to the compensation to be given.          .

2. A parol contract of a decedent to give the plaintiff a portion of his estate in consideration of services rendered, even if capable of being enforced, can only be enforced when clearly proved by direct and positive evidence, and when its terms are definite and certain.

3. Claims of this nature should receive the closest and most careful scrutiny.

4. Graham *v.* Graham's Ex'rs, 10 Casey 475, followed.

January 11th, 1886.  Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.  PAXSON, J., absent.

APPEAL from the Orphans' Court of *Philadelphia County*: Of January Term, 1885, No. 178.

Appeal from a decree of said court sustaining exceptions to the adjudication of the Auditing Judge in the distribution of the estate of Joseph Heathcote, deceased, Benjamin Sharp executor, amounting to $9,236.18, and making a final adjudication of the same.

The facts of the case sufficiently appear from the opinion of the Auditing Judge, HANNA, P. J., and the opinion of the court, delivered by PENROSE, J., in sustaining exceptions to the adjudication of the Auditing Judge.

The following is the opinion of the Auditing Judge:

Testator died April 11th, 1883, in England, he being there on a visit.  On May 4th, 1883, his last will and testament, dated December 13th, 1881, with a codicil dated May 18th, 1882, was duly admitted to probate in the register's office of this county.

Testator left neither widow nor children, his wife having died December 4th, 1881.  By his said will he bequeathed and devised to his brother, Thomas Heathcote, of London, England, absolutely one full half part of his entire estate. Out of the remaining half part he bequeathed to his niece, Maud Heathcote, five thousand dollars; to his sister, Sophia Brockelhurst, one thousand dollars; and to his niece, Annie Walls, his sisters-in-law, Clara Appleton and Annie Cox, and

his brothers-in-law, George Pearson, Robert Pearson and Alfred Pearson, each two hundred and fifty dollars ; and to his brother, Thomas Heathcote, all the rest and residue of his estate. By the codicil testator bequeathed all the property and estate which he may acquire and take under the will of Clara Appleton, sister of his deceased wife, unto Samuel Appleton, husband of said Clara Appleton. The following claims were presented against the estate :

First. That of Mrs. Annie Walls to recover upon a contract alleged to have been made by testator in consideration of services rendered, and to be rendered by her to himself and wife, to amply provide for her by will so that she should never want as long as she lived. The claim was objected to.

From the evidence presented in support of the claim it appeared that testator and his wife, together with the claimant and her mother, came to this country from England nearly thirty years ago.

Claimant was a niece of testator's wife, and then a child about six years of age. Her mother and testator's wife were sisters. Testator and his wife had no children, and becoming attached to claimant they took her into their family to educate, clothe and maintain as their own child. They sent her to school until she was about twelve years of age. Testator's wife in the meantime carried on the business of a dressmaker, and as claimant had grown old enough to be useful in the work of the household, she was taken from school and required to perform the labor and services of a domestic servant. It did not appear that any regularly employed servant did the work of the household for any length of time after claimant was taken from school. Nor did it appear that she ever received any compensation or wages in addition to her clothing and maintenance. Testator's wife was severe and exacting in the treatment of her niece, and on one occasion when the latter was about fourteen years of age severely punished her, when her mother entered the house and protested against such treatment of her child, and declared she would not permit it, and would take her away. Testator was present and pacified claimant's mother by stating that if she would permit her to remain with him and his wife he would see that she was treated differently; that she should have a good home as long as he lived, and at his death he would provide for her, and that she should never want as long as she lived.

In consequence of these statements and promises claimant was permitted by her mother to remain, and she continued to live with testator and wife, performing all the household work, and in addition assisting testator's wife in her business by sewing at night after the domestic labor of the day, continuously,

except during the interval of a visit to England with testator
and wife until the year 1873, when claimant married, and tes-
tator and his wife again visited England.    Upon their return
to this country they again commenced housekeeping, and
claimant, although married, returned to their home and per-
formed the services of a domestic.    Her husband being a sea-
man was frequently absent.    This was repeated frequently
during the years subsequent to the marriage of claimant, and
the testator and wife on many occasions expressed their grati-
tude for the services of claimant bestowed upon them.    The
former more than once declared his intention of providing
liberally for claimant in consideration of what she had done,
and promised so to do, not only in her presence but to other
persons who communicated to her the declarations made by
him, and also those of his wife, ratified and adopted by him.
Notwithstanding these promises and assurances testator on
December 13th, 1881, executed his will, bequeathing to claim-
ant only the sum of two hundred and fifty dollars, his wife
having died a few days prior to the date of the will.    On
June 26th, 1882, he sailed for England, and died there April
11th, 1883.

This claim is not to recover for the services of claimant
rendered to testator and his wife, as a domestic servant, upon
a *quantum meruit;* nor is it brought to recover upon a prom-
ise to leave her a legacy.    Both of which positions could not
be sustained.    But it is a claim to recover damages for the
non-performance of a promise and agreement of testator, in
consideration of which claimant rendered during a series of
years valuable and meritorious services.    And that contract,
as proved, was not only to amply compensate claimant, but to
such an extent " that she should never want as long as she
lived."    The making of the original promise was proved by a
single witness, it is true, but she was reliable, trustworthy,
disinterested and unimpeached.    She is corroborated by proof
of subsequent declarations and acknowledgments of such a
promise made both by the testator and his wife ; those by the
latter communicated to him and adopted by him.    They were
repeated after claimant had married and left the house of tes-
tator, and after the greater part of the services had' been ren-
dered by her.

The promise and undertaking having been proved, it is next
to be considered whether it is of sufficient certainty and pre-
cision to be enforced.

There is no question that the consideration required of
claimant was given.    She remained in the service of testator
long after she attained her majority.    The promise is not
indefinite and uncertain as in Graham *v.* Graham, 10 Casey

475, which was a promise to leave to the plaintiff " as much as to any relation on earth," but is analogous to that in Thompson v. Stephens, 21 P. F. S. 161, where the promise was if she would stay with him as long as he lived he would provide and give her full and plenty after he was gone so that she need not work." And this was held sufficiently certain and definite.

Again, in Cottrell's Estate, 2 W. N. C. 237, where the claimant rendered the testator services as a nurse and attendant, and in consideration of which he promised to leave her " independent rich," and that " he would take care of her and leave her in good circumstances after his death," the court held the contract sufficient to support an award in favor of the claimant.

The present case is distinguished from Pollock v. Ray, 4 Norris 428. In that case, SHARSWOOD, J.. who also wrote the opinion of the court in Thompson v. Stevens, said " All the declarations proved were only indicative of an intention to leave the plaintiff a legacy—to provide for her by will." It was not attempted to prove any contract by the testator, or that any services were rendered in pursuance of a contract. And in regard to the promise in this case by testator, it would be equally valid if made after the services had been performed. Snyder v. Castor's Admr., 4 Yeates 353, approved in Thompson v. Stevens.

The Auditing Judge is consequently of opinion that the claimant has proved such a contract as can be enforced. This being the case the next question is, what amount shall be awarded to her for non-compliance by testator with his agreement and contract. This was to provide for her at his death, " that she should never want as long as she lived." There was no evidence upon the subject, but the evident intention of testator was to provide for her a reasonable livelihood, having in view the magnitude of his own estate, and the probable station in life of claimant. He intended to keep her from penury and want.

By analogy to the cases upon the subject in view of testator's bequest to his niece mentioned in the will, and all the circumstances developed by the evidence, the Auditing Judge has reached the conclusion that the sum of five thousand dollars would be a fair and reasonable amount to award claimant as full compensation, and the same is accordingly awarded to her. It is not overlooked that testator bequeathed the claimant the sum of two hundred and fifty dollars. But this was a gratuity, and not in payment to claimant in performance of his contract and agreement to provide for her.

Exceptions were filed to the adjudication allowing Annie Walls five thousand dollars.

The following is the opinion of the court, delivered by
PENROSE, J., sustaining the exception :

It is perfectly well settled that an action will lie against the
estate of a decedent for breach of an agreement to make pro-
vision by will for one who, at the request of the promiser, has
performed services for him; and that compensation may also
be demanded where the claim is not barred by the Statute of
Limitations for services rendered by request, even if the per-
son rendering them did so in expectation of a legacy: Addi-
son on Contracts, *53 ; Roberts *v.* Swift, 1 Yeates 209;
Thompson *v.* Stevens, 21 P. F. S., 161, etc.   It is different, of
course, where services have been rendered without request, in
the hope of receiving a legacy, and where, consequently, there
is no contract whatever on the part of the party receiving
them.   But, as was said by Judge STRONG in Graham *v.* Gra-
ham, 10 Casey 481, such cases are " always dangerous, and,
when they rest upon parol evidence, they should be strictly
scanned.   Especially when an attempt is made, under cover
of a parol contract, to effect a distribution different from that
which the law makes, or that which the decedent has directed
by his will, should it meet with no favor in a court of law.
. . . . . Such contract may be enforced only when it is clearly
proved by direct and positive testimony, and where its terms
are definite and certain."

In the case now under consideration, Mrs. Walls, the claim-
ant, was brought to this country when a young child by the
decedent, of whose wife she was the niece.   She remained
with him as a member of his family for about eighteen years,
when she married and removed to her husband's home in
Vineland, N. J., though at various subsequent times she re-
turned with one or more of her children, and made visits of
greater or less duration.   Her marriage took place about ten
years before the decedent's death.   The parties appear to have
been in comparatively humble circumstances ; and when the
claimant, who was only six years of age when she became a
member of the family, grew old enough, she assisted her aunt
in doing the work of the house, and finally, it would seem,
during the latter years of her stay attended to it altogether
herself.   She now claims that the decedent promised, in con-
sideration of her services, and of her remaining with him for
the time she did, to make such provision for her by his will as
would support her for life.

 The only evidence of anything like an express contract on
the part of the decedent to compensate the services thus ren-
dered is found in the testimony of Mrs. Dukes, the material
parts of which are as follows :   " I knew Mr. and Mrs. Heath-
cote during their lifetime.   My former occupation was dress-

making; I learned my trade with Mrs. Heathcote. I lived in the house with them for seven or eight years. I did the work of the house until Annie was twelve years old, when she was taken away from school and had to do it. She continued to do that until she was married. I left there in 1864. She was about fourteen years of age then. I heard an interview between her mother and Mr. Heathcote, in reference to Annie, a week or two before I left. . . . . . Her aunt had been beating her, and her mother came in and she said she would take her away; that she would not have her daughter treated that way; that she had been made a slave of all her life ever since she was there. Her uncle stepped up and said if she should let her stay that things would be different; that she would have a good home as long as he lived, and at his death he would provide for her; that she should never want as long as she lived. Annie's mother agreed to let her stay, and she stayed until she was married. After I left, Annie had to do the housework and sew, too. . . . . . This conversation occurred about twenty years ago."

Assuming that the testimony of the witness as to what had thus been said twenty years before was entirely accurate, and that the claimant, upon becoming of age, might avail herself of a contract made for her during her minority, it still remains that, to entitle her to its benefits, her own part of the contract must be fully performed. Bearing in mind the principles already stated which govern cases of this character, the fair interpretation of the contract testified to is that the claimant should "stay with" the decedent as long as he lived as the consideration of his promise to furnish her with a home while he lived and provide for her at his death. She did not do this, but left him and went to her own home, where she resided at the time of his wife's death and of his own. Having thus voluntarily put an end to the contract the obligation ceased, and neither party was bound by it any longer. Compensation for services theretofore rendered, if it could be demanded at all, could only have been under a *quantum meruit* upon an implied contract; and such claim, when the decedent died, was barred by the Statute of Limitations.

The case thus, it would seem, becomes identical with Pollock *v.* Ray, 4 Norris, 428, where a similar claim was rejected by the Supreme Court.

That the parties themselves, eight years after the occurrence related by Mrs. Dukes, regarded the decedent as under no obligation, is demonstrated by the evidence of Dr. Ingraham, who was also called as a witness by Mrs. Walls, the claimant. In 1872 or 1873, it was supposed that her mother, Mrs. Elkton, was about to die, and Mrs. Heathcote, having

1 AMERMAN—30

been telegraphed for, went to Vineland.   Finding her in great distress of mind, Mrs. Heathcote asked her the cause. · Her reply was that it was because of her great anxiety as to what would become of her daughter, who, in the event of her death, " would be left without any means for her sustenance or anything of that sort."   To this Mrs. Heathcote answered, " If that is all, you need not trouble yourself, Annie will be provided for amply.   Mr. Heathcote and I have agreed that this shall be seen to, that Annie will be cared for."   " This," Dr. Ingraham testified, " seemed to quiet Mrs. Elkton very much, and she subsequently recovered from her sickness, not dying for a considerable length of time after that, and then of a different disease."

There is here no suggestion, on the part of either the mother or Mrs. Heathcote, that the decedent was already bound by a contract, such as that spoken of by Mrs. Dukes, to " provide a good home for Annie as long as he lived, and at his death to provide for her so that she should never want while she lived ; " and the distress of mind on the part of the mother is wholly incompatible with the idea of the existence at that time of such a contract.   What Mrs. Heathcote said was simply indicative of a voluntary undertaking on the part of herself and husband that the child of a dying sister should be " cared for."

Four years later, as Dr. Ingraham further testified, the decedent said to him while attending Mrs. Heathcote, who was then very ill, " My God! what am I to do?  If my wife is taken away, what is to become of me?  Annie is married, and she cannot come and take care of me any further."  He said, at the same time, that he was extremely sorry she could not come, as she had been with them for a long time, having been raised by them, and they owed her a debt of gratitude, which he did not know that money could repay, but he meant to compensate her for it. . . . . . That he would see that she was amply provided for. . . . . . He said that he and his wife felt bound by every consideration, moral and otherwise, to compensate Annie for the services she had rendered, and the great deal of care she had taken in their behalf during the time she lived with them. . . . . . He was feeling very badly, not knowing that his wife was not going to die, and regretting extremely that Annie's condition was such that she could not come to his house and take care of it as formerly."

This was in 1876.   It certainly shows nothing like a recognition of any legal obligation to provide for the claimant, but a mere gratuitous intention to do so in discharge of a " debt of gratitude."   It does show, moreover, that Annie had left him, and that she " could not come to his house and take care of it as formerly."

In 1882 the subject was again spoken of in a conversation with Dr. Ingraham, the occasion being the uneasiness of the decedent with regard to the appearance of ill health manifested by Mr. Walls, the husband of the claimant. What he then said was, "that he did not feel ready to make any provision for Mr. Walls, but he was going to do so for Mrs. Walls. . . . . . He was very frank in the expression of making ample provision for Mrs. Walls."

Henry Cox, another witness, testifies that the decedent, when his wife narrated to him what had occurred upon the occasion of her visit to Mrs. Elkton at the time of her sickness, spoken of by Dr. Ingraham, replied: "We will attend to the little girl, and see that she never wants as long as she lives. When I am gone I will take care of her." The same witness testifies that he frequently heard the decedent declare that he "would look out for Annie after he died; that she should always be cared for." Another witness, Mrs. Bentley, said that, in a conversation with her in 1876, with regard to the precarious occupation of Mr. Walls, who was a sailor, the decedent exclaimed: "Poor girl, I will take care of her while I live, and at my death she is amply provided for, *she and her child.*" And his wife coming in and asking what he was talking about, he said: "I was just telling her that we will provide for Annie during our lifetime, and at our death she is provided for. . . . . . I told Annie and her mother, and they both know. She has been a faithful girl to us and done all the work."

The only remaining witness, Mrs. Blakemore, testified that Mr. Heathcote and Mrs. Heathcote "always said they would never see Annie or her children want for anything. . . . . . They would frequently say . . . . . You know Annie was always a good little girl to us, and we will never see Annie want or her children."

All of this testimony shows nothing more than a voluntary intention, not the result of any legal obligation, either to make a testamentary provision, or that such provision had actually been made. Her children, as to whom it is not pretended there was any contract, are coupled, as some of the witnesses say, with the claimant in the references made to the subject by the decedent. There was nothing to prevent a subsequent change of intention, whether the will was only contemplated or had actually been executed. Nor could anything be more vague and indefinite and incapable of measurement than the expressions attributed to the decedent that he would "look out for" Annie, or that she should "always be cared for," or "amply provided for," &c.

The entire testimony on the part of the claimant has thus

been carefully gone over, and we have been forced to the conclusion that it does not come up to the standard required by the authorities in the class of cases to which the claim belongs. Both "the quality and sum" of the evidence, as was said in Pollock *v.* Ray, *supra*, "were insufficient to establish it," and the exception to its allowance must therefore be sustained.

It was said in Harbold's Executors *v.* Kuntz, 4 Har., 214, that "admissions are the easiest mode of testimony to lead to error, the kind of evidence most apt to be misapprehended and mistaken, and in relation to which a facile conscience may stretch itself like India rubber." Such evidence is particularly dangerous when offered in support of claims against the estates of dead men, and the witnesses undertake to detail conversations occurring many years before, and relating to matters in which they had no personal interest.

The disallowance of the claim of Mrs. Walls will leave a balance for distribution, subject to the payment of collateral inheritance tax, and the account will therefore have to be referred back for further proceeding. An opportunity will then be afforded to the accountant to ask for compensation, the omission of which in the account was not called to the attention of the Auditing Judge.

Exceptions sustained to the extent indicated, and account referred back to the Auditing Judge for further proceeding.

Final distribution was made in accordance with the above opinion of the court; whereupon Annie E. Walls took this appeal, assigning for error, *inter alia*, the decree of the court disallowing her claim for services, and sustaining the exceptions to the adjudication of the Auditing Judge distributing to her $5,000.

*Sharp* (with whom were *Alleman* and *John S. Freeman*), for appellants.

*Edwin S. Dixon*, for appellee.

Mr. Justice GREEN delivered the opinion of the Court, February 15th, 1886.

The claim of the appellant is based only upon the footing of an express contract. As she was the niece by marriage of the decedent, and was taken into his family when only six years of age, and was fed, clothed and maintained by the decedent as one of his family during all the period of her stay with him, nothing less than an express contract would be sufficient to sustain a recovery. The only direct evidence of such a contract is found in the testimony of Mrs. Dukes. The appellant being about the age of fourteen years, a conversa-

[Walls' Appeal.]

tion took place between her mother and her uncle, the decedent, in the presence of the appellant, in the following circumstances, as testified by the witness: "Her (the appellant's) aunt had been beating her, and her mother came in and she said she would take her away ; that she would not have her daughter treated in that way; that she had been made a slave of all her life ever since she was there. Her uncle stepped up and said, if she would let her stay that things would be different; that she should have a good home as long as he lived, and at his death he would provide for her; that she should never want as long as she lived. Annie's mother agreed to let her stay, and she staid until she was married. After I left Annie had to do the housework, and sew too. . . . . . This conversation occurred about twenty years ago." The *literal* meaning of these words leaves the contract upon which the claim is founded in a state of entire uncertainty in its most material part, and that is as to the length or continuance of the service which the appellant was to render. How long was she to stay? Was it one month, one year, until her marriage, or during the life of the uncle? It is simply impossible to answer this question. A species of compensation is alleged to have been fixed, to wit, a good home as long as he lived, and a provision for her at his death, so that she should never want as long as she lived. Supposing this rather indefinite compensation to be sufficiently certain to abide the test of the decisions, what was to be done by the appellant in order to entitle her to it? Admittedly, she was to render service, but how much service? Just here is the difficulty. The contract itself ought either to specify the amount of service to be rendered, or at least ought to afford the means of ascertaining or defining with some sort of precision the consideration which was to be given for the compensation claimed. If this is not done the law has no standard by which to measure the performance by the claimant of her part of the contract. Where such is the case the alleged contract is hopelessly uncertain and cannot be enforced.

While the *literal* meaning of the words of the contract as testified to by Mrs. Dukes, leaves it in such a condition of uncertainty, an implied meaning might be reasoned out that the appellant was to stay with the decedent as long as he lived, because, according to the witness, he said she should have a good home as long as he lived, and at his death he would provide for her. But if such was the meaning of the parties a still more serious difficulty arises from the fact that the appellant never performed her part of such a contract. When she was about twenty-three years of age she married and left the decedent's family and lived with her husband.

This was about ten years before the death of the testator. She rendered some service at irregular intervals afterwards, but of course this could not come within a contract for continuous service. So much of the claim as would be due upon a *quantum meruit*, before the appellant's marriage, is barred by the statute of limitations, and thus the claim is left without any adequate support of testimony to sustain it. There was other testimony of declarations and admissions by the decedent, but none of it relieves the case of the radical difficulties we have indicated. It was of the usual kind always found in such cases. None of the declarations were made to the appellant or in her presence. Some were expressions of gratitude for the services of the appellant, and some were expressions of an intent to provide for her at testator's death. In so far as they related to services rendered in the past, they could not constitute a contract relation, they were at most but the assertions of an intent to make a testamentary provision, and this, of course, depended upon the mere will of the testator. He did make some small provision for the appellant in that way, and so far as that circumstance is an indication of the testator's intent in all he had said, it disproves instead of proving, the theory that he supposed he was under a contract obligation.

The case comes almost literally within the decision of this court in Pollock *v.* Ray, 4 Norris, 428. Thus on p. 432 we said: "If the declarations had been to the effect that if the plaintiff would remain with him until his death he would then do well by her, or pay her wages, there would be some plausibility in the contention that there was a mutual contract; she to serve him until his death, and he either to provide for her by will or pay her wages. It might possibly have been sustained under the case of Thompson *v.* Stevens, 21 P. F. S., 161. This was not, however, pretended to have been the contract. Had she remained until his death it might perhaps have been implied. But in point of fact she left his service ten years before his death. There was no engagement on her part to remain a day. She might have left immediately, and her case would have stood as strong on the evidence as it is now."

In Graham *v.* Graham's Ex'rs, 10 Cas., 475, we held that the parol contract of a decedent to give the plaintiff a certain portion of his estate in consideration of services rendered, even if capable of being enforced, can only be when clearly proved by direct and positive evidence, and where its terms are definite and certain. The testimony in that case was quite as express and positive as in this. As to the length of service it was very definite, but as to the compensation it was indefi-

nite and uncertain, and for that reason chiefly it was held to be insufficient to sustain the claim.

Claims of this nature against dead men's estates, resting entirely in parol, based largely upon loose declarations, presented generally years after the services in question were rendered, and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice being done. We cannot too often repeat the cautions we have so frequently uttered upon this subject, and we feel that the present occasion is one which demands both their repetition and their application.

> The decree of the court below is affirmed, and the appeal is dismissed at the cost of the appellant.