J-S60041-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF JOHN W. MEYERS, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: WILLIAM H. MEYERS, EXECUTOR OF THE ESTATE OF JOHN W. MEYERS, SR. AND TRUSTEE OF THE TRUST OF JOHN W. MEYERS, DATED SEPTEMBER 10, 1991 | |
| | No. 1063 EDA 2015 |

Appeal from the Order Dated March 26, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): OC No. 2008-X3532

_____

| | |
|---|---|
| IN RE: TRUST OF JOHN W. MEYERS, SR., SETTLOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: WILLIAM H. MEYERS, EXECUTOR OF THE ESTATE OF JOHN W. MEYERS, SR. AND TRUSTEE OF THE TRUST OF JOHN W. MEYERS, DATED SEPTEMBER 10, 1991 | |
| | No. 1064 EDA 2015 |

Appeal from the Order Dated March 26, 2015
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): OC No. 2009-X3732

BEFORE:  BENDER, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED FEBRUARY 17, 2016**

William H. Meyers ("Meyers"), Executor of the Will of John W. Meyers, Sr. ("Decedent") and Trustee of the Trust of John W. Meyers dated September 10, 1991, appeals from the orders of the Court of Common Pleas of Montgomery County, Orphans' Court Division, declaring that Appellee, Jane M. Algard, established the existence of an enforceable oral contract to make a will between herself and Decedent.[1]   Upon careful review, we affirm on the opinion authored by the Honorable Lois E. Murphy.

Decedent died a resident of Montgomery County on October 15, 2008, leaving a will dated March 7, 2006, and a Revocable Deed of Trust dated February 16, 2006.  Decedent's wife, Eva, predeceased him on December 22, 1983.  Surviving Decedent were his five children, William H. Meyers, Mildred Trumbauer, John W. Meyers, Jr., Paul Meyers and Jane Meyers Algard ("Jane").   Pursuant to Decedent's will, his entire estate, including the family farm ("Farm"), was to pour over into a Revocable Trust.  The Trust, in turn, provided, in relevant part, that upon Decedent's death, the Farm be distributed to his grandson, William R. Meyers, son of William H. Meyers.

---

[1] The within matter was filed under two separate docket numbers in the lower court, one for the decedent's estate case-type, in which an appeal from probate and account were filed, and one for the trust matter, in which a petition to void an intervivos trust was filed.  The trial court issued identical orders on each docket and the matter has been consolidated on appeal.

At issue in this case was whether an oral contract to make a will existed between the Decedent and his daughter, Jane. Specifically, Jane claimed that Decedent had agreed to give her the Farm upon his death in exchange for living with him after the death of his wife (her mother) and providing him with assistance. Jane asserted this claim in two separate filings before the court: an appeal from probate and a petition to void an inter vivos trust, both alleging lack of capacity and undue influence and breach of contract to will. Jane ultimately opted not to pursue her lack of capacity and undue influence claims and proceeded to trial solely on the claim of contract to will.

A trial was held on January 14 and 15, 2014, after which Judge Murphy issued an opinion and order finding that an oral contract to will existed between Jane and the Decedent and that Jane was entitled to enforce her claim against the estate for a sum equal in value to the value of the Farm as of the date of Decedent's death. This timely appeal followed,[2] in which Meyers raises the following issues for our review:

> 1. Did the [c]ourt err in finding, in footnote 3 on page 2 of the [o]pinion, that [William] failed to reflect in the First and Final Account the value of assets held jointly between [William] and Decedent which were contributed back to the estate, which joint

_____

[2] Pursuant to Pa.O.C.R. 7.1, the filing of exceptions to a decree of the Orphans' Court are optional and the failure to do so will not result in the waiver of any issue on appeal that has been otherwise properly preserved. We note that the Orphans' Court did not order William to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

accounts were reflected as "Subsequent Principal Receipts" on pages 1-2 of the First and Final Account?

2.   Did the [c]ourt err in finding that the evidence offered as proof of a contract to will, including offer, acceptance and consideration, was shown with certainty and lucidity and was clear, direct, precise and convincing, in light of testimony of multiple different alleged agreements between the parties?

3.   Did the [c]ourt err in finding that the Statute of Frauds did not apply to the alleged agreement to transfer real estate pursuant to an alleged contract to will?

4.   Did the [c]ourt err in finding that [Jane] did not breach the alleged contract to will when she voluntarily vacated the farm property and ceased providing the alleged services to Decedent?

5.   Did the [c]ourt err in finding that, as a creditor of Decedent's estate, [Jane] was entitled to the full value of the entire farm, less the excluded animals and equipment, rather than the value of the services provided prior to breach, based on *quantum meruit*?

Brief of Appellant, at 3-4.

We begin by noting our standard of review:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Estate of Fuller*, 87 A.3d 330, 333 (Pa. Super. 2014), quoting *In re Estate of Hooper*, 80 A.3d 815, 818 (Pa. Super. 2013).

William first claims that the Orphans' Court erred by noting in its opinion that the account he filed in the Decedent's estate failed to reflect the

- 4 -

value of certain assets held jointly between him and Decedent, which he asserts he "contributed back" to the estate. William asserts that these accounts were, in fact, included in the account under "Subsequent Principal Receipts." We find this issue to be moot.

Upon review of the account, it does appear that the joint accounts were included as receipts of principal. *See* First and Final Account, 10/27/11, at 1-2. However, we are unable to discern the manner in which William was prejudiced by the statement made by Judge Murphy, in passing, in a footnote, in the opinion supporting her order of March 26, 2015. In the March 26, 2015 order, the court, *inter alia*, directed William to restate his account[3] and file an amended petition for adjudication "reflecting the claim of Jane M. Algard and taking a position with respect to the value of the claim." Orphans' Court Order, 3/26/15. Thus, it is clear that the restatement of the account was necessitated not by any failure on William's part to include the value of the joint assets, but by the changed circumstances created by the court's resolution of Jane's claim, as well as by the passage of time. For this reason, William is entitled to no relief on this claim.

William's remaining claims all relate to Judge Murphy's rulings regarding the existence of a contract to will and the value of Jane's claim

---

[3] We note that an order directing the filing of an account is not an appealable order as defined by Pa.R.A.P. 342.

with respect thereto. "A contract to make a will in a certain manner or to bequeath by will a specific monetary sum is recognized in Pennsylvania as valid, provided the creation of such contract and its terms are proven with clarity and conviction and valid consideration shown[.]" *Fahringer v. Estate of Strine*, 216 A.2d 82, 85 (Pa. 1966) (citation omitted). A party seeking to enforce a contract to will must bear an "exacting evidentiary burden," *Estate of Friedman*, 398 A.2d 615, 625 (Pa. 1978), which our Supreme Court has summarized as follows:

> Certain rules have been established in this area of the law: (a) a contract to make a will or to bequeath by will, as other contracts, must be established by proof of an offer, an acceptance and legal consideration; (b) the terms of the contract must be shown with certainty and lucidity; (c) the evidence must be scrutinized with great care; (d) there must be "direct evidence" in proof of the contract; [and] (e) as in the case of other claims against a decedent's estate, the evidence in proof of the contract, must be "clear, direct, precise and convincing[.]"

*Fahringer*, 216 A.2d at 85 (internal citations omitted). The testimony of a third party is sufficient to establish the existence of an oral contract. *Petro v. Secary Estate*, 170 A.2d 325, 327 (Pa. 1961) (testimony of claimant's son, who was sole witness to claimant's contract with decedent, deemed sufficient to satisfy burden of proof and establish oral contract).

Where, as here, the subject of the contract is real property, the Statute of Frauds[4] must be satisfied. Although "[t]he statute itself contains no directive as to what writing constitutes a sufficient memorandum[,] . . . decisions demonstrate that a sufficient memorandum need contain only two basic items: (1) a sufficient statement of the terms of the agreement, and (2) the signature of the grantor, i.e., the party against whom enforcement is sought[.]" **Beeruk Estate**, 241 A.2d 755, 758 (Pa. 1968) (citations omitted).

Instantly, we have reviewed the briefs of the parties, the record and the applicable law, and conclude that Judge Murphy's opinion thoroughly and correctly addresses William's claims numbered two and three, and we affirm on that basis. Specifically, the court found that: (1) credible testimony proved the existence of an oral contract to will by clear and convincing evidence; and (2) the 1991 deed of trust, in which Decedent named Jane as remainder beneficiary,[5] unambiguously memorializes the Decedent's intention under the parties' agreement and constitutes a sufficient

---

[4] The Statute of Frauds, Act of March 21, 1772, 1 Sm. L. 389, sec. 1, 33 P.S. 1, requires that a transfer of title to real estate be in writing, or by act and operation of law.

[5] Under the 1991 trust, Jane was to receive the Farm and all household property. Decedent gave his son, John, Jr., the option to continue farming the land for a period of one year after the Decedent's death, and thereafter by lease from Jane at her discretion. In 2006, Decedent executed a Revocable Trust Agreement that amended and restated the 1991 agreement in its entirety and gave the Farm to Decedent's grandson, William R. Meyers.

memorandum so as to satisfy the Statute of Frauds. **See** Orphans' Court Opinion, 3/23/15, at 9-14.

In his final issues, William asserts that the court arrived at an incorrect measure of damages in awarding to Jane the value of the entire Farm, rather than the value of the services she performed prior to her alleged breach. William claims that, because the agreement between Jane and the Decedent is unenforceable, Jane is entitled only to *quantum meruit*. William further asserts that, because claims in implied contract are subject to six-year statute of limitations, Jane's claim is barred because it accrued prior to July 15, 2003, six years prior to the date the estate accounting was filed in this matter. Brief of Appellant, at 21, citing **Estate of Koonce**, 161 A. 578 (Pa. Super. 1932) (statute of limitations bars claims for wages earned in performance of services more than six years before filing of debtor's estate account). We have already concluded that Judge Murphy properly determined that an enforceable contract to will existed. Thus, this argument fails.

In the alternative, William asserts that, even if the parties did have an enforceable agreement, Jane breached the agreement in October 2001 when she moved out of Decedent's home. Thus, William argues, the statute of limitations on Jane's claim for *quantum meruit* began to run in October 2001, such that Jane's claim was barred as of 2007. We find this claim to be without merit.

Judge Murphy found that the credible evidence and testimony adduced at trial demonstrated that "the circumstances and events that occurred in the spring of 2001 through October 2001 caused Jane to leave [Decedent's] home and prevented Jane's continued performance" under the parties' agreement. Orphans' Court Opinion, 3/23/15, at 15. Specifically, following Decedent's hospitalization for a quadruple bypass in April 2001, family discord arose that appeared to originate with Jane's suggestion that Decedent sell his cows because of his ill health. *Id.* at 16. Although Decedent had agreed to sell the cows, "it appears that Jane's exercise of authority regarding the sale of the cows and the proposed sale of the farm equipment provoked a negative reaction from the rest of the family." *Id.* at 16-17. Decedent became cold towards Jane and began to "shun" her. *Id.* at 18. Decedent ignored Jane and refused to speak to her. Living under these conditions took an emotional toll on Jane and caused her lupus to flare up. *Id.* at 17-18. Jane had difficulty sleeping, her hair fell out in clumps, she lost her appetite, and her walking became "stilted and rigid." *Id.* at 18. As a result of the adverse impact the situation was having on her health and emotional well-being, Jane and her husband decided to leave Decedent's home. *Id.*

In light of the foregoing, the court concluded that Jane fulfilled her obligations under the parties' agreement until such time as the Decedent's actions no longer permitted her to do so. As such, the court concluded that Jane did not breach the contract and was entitled to enforce the agreement

against the estate. Our review indicates that the Orphans' Court's findings are all supported by competent evidence of record. ***Estate of Fuller***, ***supra***.

Moreover, the court did not err in awarding Jane the full value of the Farm as of the date of Decedent's death. "It is well settled, as a principle of fundamental justice, that where one party to a contract is himself the cause of a failure of performance by the other party, he cannot take advantage of his own breach of the contract in so doing, to prevent a recovery by the other party[.]" ***Edelman v. Boardman***, 2 A.2d 393, 395 (Pa. 1938) (citation omitted). As Decedent's own actions prevented Jane from performing her obligations under the agreement, Jane is entitled to receive the full benefit of her bargain.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/17/2016

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: ESTATE OF JOHN W. MEYERS, DECEASED

NO. 08-X3532

*  *  *  *  *-*  *

IN RE: TRUST OF JOHN W. MEYERS, SR., SETTLOR

NO. 09-X3732

OPINION

J. Murphy                                                                                    March 23 , 2015

Before this Court are two petitions filed concurrently February 25, 2010 under separate

docket numbers: an Amended Petition Sur Appeal from Probate[1] filed pursuant to Section 908 of the

Probate Estates and Fiduciaries Code ("PEF Code") under Montgomery County Orphans' Court

docket number 2008-X3532 and an Amended Petition filed pursuant to Section 7754 of the PEF

Code to Void an Intervivos Trust[2] filed under Montgomery County Orphans' Court docket number

2009-X3732. The primary issue in dispute is whether an oral contract to make a will existed between

the decedent and his youngest daughter Jane Meyers Algard and, if so, what impact does that have

on the distribution of decedent's Estate under the Will dated March 7, 2006 and the Revocable Deed

of Trust dated February 16, 2006. A hearing was held January 15 and 16, 2014 on these matters at

---

[1] Petitioner, in the Amended Petition Sur Appeal from Probate, alleges the decedent lacked testamentary capacity to execute the 2006 Will; was subject to undue influence; and breach of contract to make a will.

[2] Petitioner, in the Amended Petition to Void an Intervivos Trust alleges the decedent lacked capacity to execute the 2006 Deed of Trust; was subject to undue influence; and breach of contract to will or make an obligation dischargeable at death; and lack of capacity to transfer by deed. It should be noted that counsel for Petitioner did not address the issues of undue influence or lack of capacity at trial or in his post trial memorandum and therefore we do not address these issues in this Opinion.

which time counsel for the respective parties submitted Stipulation of Fact and Exhibits to the Court.[3]

According to the Stipulation of Fact and Exhibits of the parties, the following facts are not in dispute:

1.    John W. Meyers, Sr. was a resident of Montgomery County with a principal residence of 141 Miller Road, Schwenksville, Pennsylvania 19473 at the date of his death.

2.    John W. Meyers, Sr. died on October 15, 2008 at the age of 93.

3.    His wife, Eva Meyers, died on December 22, 1983.

4.    John and Eva Meyers had five children; William H. Meyers ("William H."), Mildred Trumbauer ("Mildred"), John W. Myers, Jr. ("John Jr."), Paul Meyers ("Paul") and Jane Meyers Algard ("Jane").

5.    Following the death of Eva Meyers in 1983, Jane, at the request of John Sr. began to assist her father in the running of the family household.

6.    In 1984 John Sr. engaged attorney Marvin J. Lewis to prepare estate planning documents.

7.    On February 16, 1984, Marvin J. Lewis, Esquire sent to John Sr. a draft of a Will he prepared for him. True and correct copies of the February 16, 1984 letter, the February 16, 1984

---

[3] A First and Final Account was filed under the Estate docket number by William H. Meyers, the decedent's son and named executor under the March 2006 Will. To date, there has never been an Account filed for the Deed of Trust. The Trust is the residuary beneficiary under the Feb 2006 Will and there appear to have been significant assets held by the Trust as a result of the Agricultural Conservation Easement executed by Settlor prior to his death which generated approximately $900,000. *See,* Exhibit I. The Court is not currently able to adjudicate the Account filed for the Estate due to several deficiencies contained in the account as stated and an amended account will have to be filed to correct these deficiencies and bring the account current particularly in light of this Court's findings in this Opinion and Order. Furthermore, William H. Meyers testified that he held several accounts jointly with his father. Despite the fact that these accounts were held jointly, he testified that the money in these accounts passed through his father's estate. Upon review of the First and Final Account filed in the Estate of John W. Meyers, Sr. it does not appear that these bank accounts are listed in the principal receipts. NT 1/15/14, morning session, p. 99-101.

2

draft Will, and the signed Will dated February 28, 1984 are attached as Exhibit A to the Stipulation of Fact and Exhibits (hereinafter referred to as "the Stipulation of Fact").

8. On October 5, 1990, John W. Meyers, Sr. was sent a draft Will by his attorney Marvin J. Lewis. A true and correct copy of the October 5, 1990 letter is attached as Exhibit B to the Stipulation of Fact.

9. On November 13, 1990, John Sr. executed the new Will prepared by his attorney. A true and correct copy of the duly executed Will is attached as Exhibit C to the Stipulation of Fact.

10. On September 10, 1991, John Sr. executed a revocable living trust, known as The Trust of John W. Meyers. A true and correct copy of this Trust is attached to the Stipulation of Fact as Exhibit D.

11. On May 2, 1995, John Sr. executed a new Will. A true and correct copy of this Will is attached to the Stipulation of Fact as Exhibit E.

12. On May 2, 1995, John W. Meyers, Sr. transferred assets to the Trust as shown by the Schedule of Trust Assets. A true and correct copy of this schedule is attached to the Stipulation of Fact as Exhibit F.

13. On February 16, 2006, John Sr. executed a Revocable Trust Agreement that amended and restated in its entirety the previous Revocable Trust Agreement. A true and correct copy of this document is attached as Exhibit G to the Stipulation of Fact.

14. On March 7, 2006, John W. Meyers executed a Last Will and Testament which revoked all prior Wills. A true and correct copy of this Will is attached as Exhibit H to the Stipulation of Fact.

15. On September 29, 2006, John W. Meyers as Trustee of the Revocable Trust Agreement, executed an Agricultural Conservation Easement in the property at 141 Miller Road,

3

Perkiomen Township, Montgomery County, Pennsylvania in favor of Perkiomen Township, in perpetuity. A true and correct copy of the Agricultural Conservation Easement is attached to the Stipulation of Fact as Exhibit I.

16. On April 3, 2007, John W. Meyers, as Trustee for the Revocable Living Trust, executed a deed transferring the property at 141 Miller Road, Perkiomen Township, Montgomery County, Pennsylvania to his grandson William R. Meyers. A true and correct copy of this deed is attached to the Stipulation of Fact as Exhibit J.

## BACKGROUND

John W. Meyers, Sr. ("John Sr.") was a dairy farmer who lived at 141 Miller Road in Perkiomen Township until he died at age 93. John had five (5) children: William H. Meyers ("William H."), Mildred Trumbauer ("Mildred"), John W. Myers, Jr. ("John Jr."), Paul Meyers ("Paul") and Jane Meyers Algard ("Jane"). John Sr.'s wife Eva died in late 1983. During the years following her death, John Sr. was retired from a job where he had worked at B. F. Goodrich. He collected social security and a pension, and worked daily in the dairy barn, in the fields and on farm activities including feeding and milking the cows. Jane's older brother John Jr. was living at the home until he married in 1985.[4] Jane and John were the siblings who primarily took care of their father at this time and worked on the farm after their mother died. NT, 1/16/14, p. 34.

Prior to and following her mother's death in 1983, Jane continued to live with her father in the family home. It is alleged that following Eva's death, John Sr. first approached Jane and offered to leave her the farm if she would continue to live on the farm and continue her mother's work. The

---

[4] At that time he and his wife moved across the street to his grandfather's farm which he had bought around 1981. NT, 1/16/14, p. 18. John Jr. continued to work on his father's farm until 2001 when the cows were sold. NT, 1/16/14, p. 22. John Jr. was primarily responsible for milking the cows twice daily, planting and harvesting crops, in addition to running his own farm where he raised hogs and later switched to cattle. NT, 1/16/14, p. 19; NT, 1/15/14, afternoon session, p. 37.

4

only evidence this Court was presented with supporting the allegation that an agreement between Jane and her father existed at this time are the terms of the February 1984 Will signed by John Sr. in which he left a life estate in the farm to Jane. NT, 1/15/14, afternoon session, pp. 39-40. Specifically paragraph Second, subparagraph A of the 1984 Will provided Jane to be granted a life estate in the farm to retain the same until she marries or until she wishes to leave, whichever first occurs, and so long as she keeps the property in good repair and in a clean and neat manner. At such time as she dies or otherwise relinquishes her right to the life estate, the property shall be sold and the proceeds thereof divided equally between the five siblings, subject to an option to buy given to John Sr.'s three sons. Under this Will, Jane was responsible for paying the inheritance tax on her life estate. *See*, Last Will and Testament of John W. Meyers dated February 28, 1984, Exhibit A to the Stipulation of Facts and Exhibits. Although the contents of the will provide some evidence of a possible agreement, no other evidence connects the provisions of this will to a specific agreement between John Sr. and Jane

Jane was not permitted to testify as a consequence of the application of the Dead Man's Act. However, her husband Edward Algard ("Edward") testified to his knowledge of an agreement between Jane and her father regarding the future of the farm if Jane stayed and continued her mother's work.

Jane met and began to date Edward in approximately 1989. NT, 1/15/14, afternoon session, p. 22. Edward moved into the farm house with Jane and her Father in 1990 and they were married on October 2, 1992. NT, 1/15/14, afternoon session, p. 22, 26. He testified that he was present on several occasions where the agreement between Jane and John Sr. was discussed.

5

Jane took primary responsibility for the housekeeping at the farmhouse which was a seven-day-a-week job. NT, 1/15/14, afternoon session, p. 29. Jane was primarily responsible for cooking breakfast for her father and all of the people, mostly men, who came at 5:30 in the morning to work on the farm, daily. These family members and other workers would arrive to feed and milk the cows and attend to other chores, after which they would gather in the farmhouse for breakfast. Jane would cook a large – eggs, bacon, toast– breakfast for everyone who was present, prepare the meals, clean up after the meals, mop and sweep the floors and was responsible for cleaning the house, doing all of the laundry using a ringer, making the beds and cleaning the kitchen and preparing all the meals, including the evening meal. Jane mowed the lawn near the house itself, fed the cats and dogs and tended the flower beds and a vegetable garden. NT, 1/15/14, afternoon session, p. 32-34. Because most of the clothes she washed were heavily soiled, Jane used a washer ringer as opposed to a modern washing machine for those items. NT, 1/15/14, afternoon session, pp. 30-31. She would on occasion also feed the calves, remove the muck from the stalls, throw hay or straw in the stalls and wash up the milk cans. NT, 1/16/14, pp. 18-27; NT, 1/15/14, afternoon session, pp. 27-37. Edward testified that Jane worked about 3 hours each day on the farm during the week and nine hours on both Saturdays and Sundays, totaling 33 hours per week. NT, 1/15/14, afternoon session, pp. 34-35. Testimony revealed that none of the sons or any of their wives helped Jane with the cooking, cleaning, laundry, gardening or housekeeping. Nor did any of them testify that they gave Jane any break or relief from the housekeeping, cooking and cleaning activities that were her responsibility on a day-to-day basis, 365 days a year. NT, 1/15/14, morning session, p. 26, 59; NT, 1/15/14, afternoon session, p. 37-38; NT 1/16/14, p. 23, 51-52. Jane performed all of these duties in addition to maintaining a full-time job at Harleysville Insurance.[5] Jane and Edward did not take vacations. NT,

---

[5] Jane would get up at 5:30 in the morning and get herself ready to go to work. NT, 1/16/14, p. 24; NT, 1/15/14, afternoon session, p. 22. She would then perform the aforementioned duties. Jane would then leave for work at

1/15/14, afternoon session, p. 41. Jane did not complete her education. NT, 1/15/14, afternoon session, p. 46. Jane performed these duties for a period of nearly 18 years, from 1983 until 2001.

In 1990, Edward moved into the house with Jane and her father, John Sr. NT, 1/15/14, afternoon session, p. 26. Edward testified to his recollection of a specific conversation about their agreement in 1990 or 1991, following the death of Edward's mother in December of 1990. NT, 1/15/14, afternoon session, p. 39. Following his mother's death, Edward considered purchasing his mother's home and moving to that home with Jane. This was discussed with John Sr., who after hearing of their plans said to Jane, "You can't leave. We have an agreement". NT, 1/15/14, afternoon session, p. 40. According to Edward, John Sr. stated that if she stayed and did the housework that she would get the house and a couple of acres. Jane responded by saying that "I will stay and do the housework". NT, 1/15/14, afternoon session, p. 40, 61. Edward testified that as a result they declined the opportunity to purchase his mother's house. NT, 1/15/14, afternoon session, pp. 39-41. On October 2, 1992 Edward and Jane married and he and Jane continued to live in the house with John Sr.

Following the aforementioned conversation, on September 10, 1991 attorney John Eisenmann came to the farm house to see John Sr. Edward and Jane were present at the farmhouse as well and were surprised to see him. Attorney Eisenmann asked Jane "Where's your father? I am here to have this trust signed by your father." They all sat down at the kitchen table and reviewed the deed of trust. At that time, according to the testimony of Edward, John Sr. said "This is what I promised to Jane." NT, 1/15/14, afternoon session, p. 41-43. Edward testified he was present at the time John Sr. executed this revocable deed of trust.

---

7:30 a.m. and return at 5 p.m. at which time she would prepare a large Pennsylvania Dutch dinner and do the laundry. NT, 1/15/14, p. 30, afternoon session.

7

The John W. Meyers Revocable Deed of Trust, dated September 10, 1991 specifically provided that upon the death of John W. Meyers, the remaining income and principal of the trust, including all real property and household personal property and all lawnmowers, but not including all animals, crops, tools, farm machinery and equipment, farm implements and farm vehicles shall be distributed absolutely to Settlor's daughter, Jane E. Algard. This trust provided that, should he elect to do so, Settlor's son John W. Meyers Jr., would have the right to continue to farm the land and use the outbuildings, all animals, crops, tools, farm machinery and equipment, farm implements and farm vehicles (but not the house or all household furnishings therein) for a period of one year from the date of the death of Settlor. When John Jr. no longer continued to farm, the outbuildings, all animals, crops, tools, farm machinery and equipment, farm implements and farm vehicles originally belonging to Settlor, were to be sold by the then Trustee and the proceeds distributed in four (4) equal shares to William H. Meyers, John W. Meyers, Jr., Paul H. Meyers and Mildred Drumbore, or their issue per stirpes.

On May 2, 1995 John Sr. executed a new Will in which he named this trust as the residuary beneficiary. Edward testified that John Sr. again orally reaffirmed his agreement with Jane in 1999. NT, 1/15/14, afternoon session, pp. 69-71.

William R. Meyers ("William R."), the nephew of Jane and grandson of John Sr., also testified that he was aware that there was an agreement between Jane and her father regarding her staying to care for her father, keep house, prepare meals and assist with farm duties and Jane would receive the farm after his death. William R. testified at trial that he learned in approximately the early 1990's that there was an oral agreement between his grandfather and his Aunt Jane that she would get the farm and "that all she had to do was stay". He testified that his grandfather had told him that he had an agreement with Jane, although he said that he never saw any agreement in

8

writing. William R. also testified that his Aunt Jane always lived in the house, helped to take care of grandmom and helped to take care of grandpop and had talked to him about this agreement. NT, 1/15/14, pp. 8-11, 19, 22-28. William R. was asked to clarify his statements made during his deposition about whether the provisions of the 1984 Will was consistent with what his grandfather told him in the early 1990's about Jane getting the farm and he answered "yes... he just said she would be getting it." William R. said that his grandfather, John Sr., never explained. NT, 1/15/14, pp. 19-22, citing deposition of William R. Meyers on 10/17/12 pp. 19-20. When asked if the terms of his grandfather's 1990 Will were consistent with his understanding of the agreement between the two, William R. stated "Before he died all I assumed she was getting it." NT, 1/15/14, p. 25.

Jane's brother William H. Meyers ("William H.") also testified that he knew of the agreement between his father and Jane. NT, 1/15/14, pp. 59-60. He stated that his father was very much a man of his word. NT, 1/15/14, p. 60.

## DISCUSSION

Based upon the foregoing, this Court concludes that credible evidence establishes that an oral contract to make a will did in fact exist between John Sr. and his daughter Jane.

Pennsylvania law recognizes oral contracts to make a Will provided that the oral contract was entered into before January of 1993. *See Fahringer v. Estate of Strine*, 420 Pa. 48, 52, 216 A.2d 82 (1966). There is no question that the offer was made and accepted and that the offer and acceptance occurred before January of 1993 as discussed in this Opinion and Order. Under the Supreme Court decision in *Fahringer*, proof is required of the creation of the contract and the terms of the contract. In *Estate of Friedman*, 483 Pa. 614, 398 A.2d 615 (1978), the Pennsylvania Supreme Court summarized the evidence necessary to establish an oral contract to make a Will as follows:

9

> Certain rules have been established in this area of the law:
> (a) A contract to make a Will or bequeath by Will, as other contracts, must be established by proof of an offer, and acceptance and legal consideration;
> (b) The terms of the contract must be shown with certainty and lucidity;
> (c) The evidence must be scrutinized with great care;
> (d) There must be "direct evidence" in proof of the contract;
> (e) As in the case of other claims against a decedent's estate, the evidence in proof of the contract must be "clear, direct, precise and convincing. *Estate of Friedman,* 438 Pa. at pp. 634-35, *citations omitted.*

It is well established that an agreement to make a will or to devise one's property to a particular person or for a particular purpose is binding and irrevocable when supported by valid consideration. *See, Gredler Estate,* 361 Pa. 384, 387 (1949)(*citations omitted*). Considering the evidence in this case, the testimony of the witnesses as well as the decedent's testamentary documentation consistently demonstrates that there was an oral offer, an acceptance and legal consideration.

There is no question that the decedent, John Sr., made an offer to his daughter Jane, that the offer was accepted and that there was consideration. Nor is there any ambiguity that John Sr. made a specific offer to his daughter Jane that she would receive "the farm" in consideration for her services until his death. Jane accepted her father's offer of the farm and in exchange she continued the work around the farm and the farmhouse as her mother had prior to her death in 1983. Courts in the Commonwealth have repeatedly found that an offer to provide support and care constitutes adequate consideration for a contract. Jane accepted the offer and performed services in consideration of the offer. *In re Estate of Beeruk,* 429 Pa. 415, 241 A.2d 755, 758-59 (1968).

In this case, the evidence in proof of the contract meets the standard that it is clear, direct, precise and convincing. Testimony of several witnesses acknowledged such an agreement

10

between John Sr. and his daughter Jane. The testimony of Jane's brother William H. and his son William R. was particularly compelling in that they corroborate the existence of a contract between John Sr. and Jane; a position adverse to their interests. It was clear to this Court that these witnesses knew of the agreement even though it appeared that they were consciously restraining their testimony in this regard. Decedent's grandson, William R., testified that decedent acknowledged to him that he had made such an offer to Jane.

The testimony of Jane's husband Edward, was most credible and persuasive in establishing the existence of an agreement to make a will. Edward provided the most direct knowledge of the agreement as it existed in the early 1990's. He testified clearly and competently as to his understanding of this agreement based upon his observations of discussions between Jane and John Sr., as well as his conversations with each of them. His testimony that John Sr. exclaimed "but we have an agreement" when presented with the possibility that Jane might leave the farmhouse and move into Edward's mother's home establishes that John Sr. recognized the agreement and her obligation under that agreement to stay with him. Edward's recollection of events at this time is also bolstered by the terms of the 1991 revocable deed of trust executed by John Sr. in September 1991 as well as John Sr.'s declaration at this time that "this is what I promised Jane." Edwards testimony clearly established the agreement between Jane and her Father that Jane promised to stay with her father and continue the housekeeping in exchange for his promise to leave her the farm.

The next question the court must determine is what is meant by "the farm" and whether the terms of the agreement have been established with sufficient "clarity and certainty". *See, Fahringer v. Estate of Strine*, 420 Pa. at 52. Certain Pennsylvania cases have found no enforceable contract where the promise was too imprecise, such as a promise that 'you will be

11

taken care of for the rest of your life' or 'you will never need to worry.' However a fractional share of an estate or the entire estate or a devise of real property is sufficiently specific.

It is maintained by Petitioner that the agreement with her father was established in 1984 or thereabouts, following her mother's death. The only evidence this court received that could possibly establish the agreement at this time are the terms of his 1984 Will as mentioned specifically earlier in this opinion, and a possible inference that there was an agreement. As Jane was precluded from testifying as a result of the application of the dead mans act and no other witnesses provided testimony corroborating the agreement back to 1984, this Court cannot conclude that the testamentary words used in the 1984 Will were in furtherance of a specific agreement with Jane.

It is only around 1990 and thereafter that multiple witnesses' testimony corroborates such an agreement between Jane and her father, which culminated in the execution of the 1991 deed of trust executed by John Sr.. This 1991 Trust provided that, upon the death of John Sr. the remaining income and principal of the trust, including all real property and household personal property and all lawnmowers shall be distributed absolutely to Settlor's daughter, Jane E. Algard. We have the testimony of Edward Algard who was present at the signing of this document and heard John Sr. state that "This is what I promised Jane." Thus it appears to this Court that the terms of the 1991 deed of trust memorialize the term of "the farm" as intended by John Sr.

Counsel for Respondent argues that if an agreement is deemed to exists, its terms are ambiguous and therefore unenforceable. This Court disagrees. The terms of the agreement are not ambiguous. John Sr.'s intention as memorialized in the 1991 Trust is clear, and he declared that this was what he had promised Jane. Until 2001, Jane performed her part by staying with

12

her father and continuing the housework around the farm. John Sr. performed his part by providing a mechanism by which Jane would receive the farm upon his death.[6]

Counsel for Respondent has also made a claim that as the oral agreement deals with real property, it cannot be enforced as it is barred by the statute of frauds. The Pennsylvania Supreme Court addressed this issue in *In re Estate of Beeruk, infra.* In *Beeruk,* the Court addressed the issue of whether the statute of frauds precluded a nephew from enforcing an oral agreement to make a will where his uncle promised to leave him his estate which was comprised of both real and personal property. That Court held that where the parol evidence is clear that the will was intended to embody the terms of the contract, and there is no substantial possibility of fraud present, it is not necessary for the will to refer specifically to the contract. *In re Estate of Beeruk,* 429 Pa. at 420, 241 A.2d at 758. The parol evidence offered in *Beeruk* was the testimony of the nephew as well as the scrivener of the prior will who stated that the decedent told him the nephew was to receive his entire estate upon his death for moving his family from Poland to care for him and he drafted the will accordingly.

In the instant matter before this Court we have the terms of the 1991 deed of trust, the testimony of Edward Algard who was present at the execution of that trust as well as the testimony of William R. who testified that his grandfather, John Sr. told him in the early 1990's that Jane would get the farm if she stayed at the farmhouse. NT, 1/15/14, morning session, p. 19-20. The following is an excerpt from the cross examination of William R. during the January 15, 2014 hearing:

> Q: (In relation to a question during his deposition regarding the 1984 Will) [Are the terms of that Will] consistent with what your grandfather told you in the

---

[6] This Court recognizes that Jane left the farm prior to her father's death. The effect of this act by Jane on the enforcement of this agreement is discussed *infra.*

13

early 1990's that Jane is getting?

A: I said yes.

Q: Okay. Then I asked you, "Did he say that she" – "was getting it outright or she was just getting it?"

A: I said that she was just getting it...

Q: Now, at that time when you are having this conversation with your grandfather, you didn't think there was anything odd about the fact that Jane was getting the farm because she was doing work on it, right?

A: No.

NT, 1/15/14, morning session, p. 19-22.

This Court concludes that the based upon the evidence received, particularly the testimony of William R., whose interests are adverse to that of Petitioner, as well as the testimony of Edward Algard, who was present when John Sr. executed the deed of trust, that there is no substantial possibility of fraud present, and therefore it is not necessary for the instrument to specifically refer to the contract/agreement. Furthermore, this Court finds it revealing that John Sr. later entered into a substantially similar agreement with William R. which is evidenced by the February 16, 2006 Deed of Trust and the March 7, 2006 Will. In those documents he provided for distribution of the farm to William R., who had agreed to live with and care for him. This Court finds that John Sr.'s similar agreement with William R. further reinforces the evidence that the 1991 deed of trust memorialized his agreement with Jane, again alleviating any substantial possibility of fraud. Accordingly, this Court finds that a valid and enforceable oral agreement to make a will, and specifically to leave the farm property to Jane, existed between John Sr. and Jane and is not barred by the statute of frauds.

14

The next issue this Court must address is whether Petitioner has fulfilled her part of the contract. It is clear that Jane moved away from the farm in 2001. However it is also clear to this Court that Jane was not permitted to complete her contractual duties. Jane stayed with her father and performed her duties from 1983 until 2001. It is not disputed that Jane and Edward moved out of John Sr.'s home in October 2001. What is disputed however is whether they moved out on their own volition or whether they were forced to leave. After reviewing credible evidence and testimony, this court concludes that the circumstances and events that occurred in the spring of 2001 through October 2001 caused Jane to leave her father's home and prevented Jane's continued performance became impossible for her.

Pennsylvania Courts have upheld an oral agreement to make a will where one party has substantially performed the services agreed-to and has at some point been forced to cease performing those services. *See, In Re: McCahan's Estate*, 221 Pa. 188, 70 A.2d 711 (1908). In *McCahan*, the claimant went to live with her aunt and take care of her. The niece gave up her education to take care of her aunt in exchange for the promise of 100 shares of McCahan Sugar stock. The contract to make a Will was then memorialized by the execution of a Will consistent with the terms of the agreement. It appears that the contract was proved with sufficient clarity and directness. The niece performed services for her aunt from 1900 to 1902. On that date, a sister of Mrs. McCahan superseded the niece in the close position. Thereafter the conditions for the niece became intolerable in the home and the niece eventually moved out of the residence. The auditing judge calculated the value of the damages and awarded damages to the niece based upon her two years of service. This decree was affirmed by the Pennsylvania Supreme Court.[7]

---

[7] The *McCahan* court determined the niece's damages to be $5,000. The Court arrived at that figure by taking the value of the stock at the time of her death and multiplied it by the number of months of the service she provided over the total number of months from the beginning of the niece's service until her aunt's death, less the amount left to her under the Will. If this Court were to determine damages in a similar manner in the instant matter the

15

Credible testimony of Edward Algard established that the relationship between Jane and her father had been excellent. N.T. 1/15/14, afternoon session, p. 43. He stated that John Sr. would often talk with Jane and confide in her about things that were troubling him. NT 1/15/14, afternoon session, p. 44. It appears that their bond may have been closer than the relationship between the decedent and his other children. For example, sons John Jr., and William testified that their father was a man of few words and apart from working on the farm they did not visit much with him socially. Marion Meyers, wife of William H., testified that after Eva Meyers died in 1983 they did not go over to the farm much, only at Christmas time. NT 1/16/14, p. 51. Although Jane and her father maintained a great relationship for most of their life, family discord began in early spring 2001.

John Sr. had quadruple bypass surgery in April 2001. Thereafter he spent six weeks in rehab at Silver Stream nursing home. Jane visited her father every day. It was during one of these visits where Jane discussed with her father the selling of the cows on the farm because of his health. John Sr. agreed to sell the cows at that time. NT, 1/15/14, afternoon session, p. 45. Other family members acknowledge that John Sr. knew the cows were going to be sold. NT 1/15/14, morning session, p. 36, 72; NT, 1/16/14, p. 31. In fact, John Sr. and John Jr. had showed the dairy cows to a prospective buyer prior to John Sr.'s heart surgery. NT, 1/15/14, p. 70-71. Jane took steps to sell the cows which were eventually sold on May 16, 2001. NT, 1/15/14, afternoon session, p. 46. It is not entirely clear precisely what caused the ensuing family discord, although, according to the testimony of William R. it was the manner in which the dairy cows were sold that upset everyone including John Sr. NT 1/15/14, morning session, pp. 35 & 71-73. From the cryptic facts to which the parties testified, it appears that Jane's exercise of authority

result would be the value of the farm (excluding equipment and animals, etc.) multiplied by 18 years/25 years (or approximately ¾ the value of the farm). However, this Court is of the opinion that such measure of damage is not proper and we are bound to determine the damages as set forth in *In Re: Beeruk's Estate, supra.*

regarding the sale of the cows and the proposed sale of the farm equipment provoked a negative reaction from the rest of the family.

On or around June 23, 2001, after John Sr. had returned from rehabilitation, an alleged dispute occurred between Edward, John Sr. and Harry Weidenbaugh, a friend of John Sr. NT 1/15/14, morning session, pp. 75, 87. At that time Harry had arrived to pick up John Sr. and take him to an auction that was being held at his sister's house. NT 1/15/14, morning session, pp. 74-75. The nature of this dispute is not clear as Edward testified that he did not recall any argument with Harry. NT 1/15/14, afternoon session, pp. 47. That same day, another alleged dispute arose between Edward and Josh Sutter, John Jr.'s step-grandson, regarding the sale of farm equipment. NT 1/15/14, morning session, pp. 77-78; NT 1/16/14, p. 11. Josh was concerned with the possible stress the sale of the equipment may cause John Sr. and he informed William H.'s wife, Marion, that he did not believe John Sr. should live in the farmhouse. NT 1/16/14, p. 11-13. Later that day, William H. called a family meeting including all family members with the exception of Jane. According to William H., "she was part of the problem". At this meeting it was decided that John Sr. would live with William H. for a little while. NT 1/15/14, morning session, p. 79. John Sr. stayed with William H. from June 23, 2001 until July 6, 2001 when he returned to his farmhouse. NT 1/15/14, morning session, p. 88. The day prior to July 6th however, William H. took John Sr. to see an attorney, Glenn Moyer, Esquire to have himself added on as co-agent under power of attorney. NT 1/15/14, morning session, p. 83-84.

When John Sr. was taken to William H.'s house on June 23, 2001, no one informed Jane of his whereabouts. NT 1/15/14, morning session, p. 86-87. Edward testified that Jane's brother Paul eventually told them where John Sr. was. NT 1/15/14, afternoon session, p. 48. Jane was very upset with the state of affairs surrounding her father. It took a great toll on her emotionally

17

causing her lupus to flare up. NT 1/15/14, afternoon session, p. 50-52. When John Sr. returned to his home on July 6, 2001, Edward testified that he noticed a change in their relationship. John Sr. became cold towards Jane and began to shun her. He ignored Jane and would not talk to her. N.T., 1/15/14, afternoon session, p. 52. While Jane continued to work around the farmhouse, the toll of her father's behavior began to heavily impact her well being. Edward observed that she had difficulty sleeping, her hair began falling out in clumps; she lost her appetite, her walking was stilted and rigid. NT 1/15/14, afternoon session, p. 50-54. He became concerned that the emotional distress she was suffering would cause her to lose her job and health insurance. NT 1/15/14, afternoon session, p. 55, 57. Concerned for Jane's wellbeing, Jane and Edward made the decision to leave her father's farmhouse.

This Court concludes that credible testimony established that the actions of John Sr. constituted, in effect, a constructive discharge of Jane. Jane and Edward no longer felt welcome to live at the farm house. In this sense, it was John Sr. who breached the agreement with Jane. Jane fulfilled her end of the bargain until she was no longer permitted to do so. Accordingly, as Jane was not permitted to continue her performance in fulfilment of the agreement, she is not precluded from seeking to enforce the agreement. *See, Helpin v. Trustees of the University of Pennsylvania,* 969 A.2d 601 (Pa. Super, 2009), *aff'd,* 608 Pa. 45 (2010)(constructive discharge may serve as the basis for recovery where an employer has made working conditions so intolerable that the employee has been forced to resign).

Having concluded that an enforceable agreement existed between John Sr. and Jane, and that Jane was prevented from fulfilling her part of the agreement, the Court must now address the measure of damages. This court is bound by the matter of *In re: Estate of Beeruk, supra,* in determining Jane's damages. In *Beeruk,* following his wife's death, the decedent promised his

nephew that he would leave his entire estate to him if he moved, with his wife and child from Poland to the United States and take care of him. The nephew eventually agreed and relocated his family to live with his uncle. Upon their arrival, the uncle had his attorney prepare a Will in which he left his entire estate to his nephew. The uncle later remarried and executed a new will leaving his estate to his new wife. Following the death of his uncle, the nephew sought to enforce the oral contract he had with his uncle. The Pennsylvania Supreme Court in *Estate of Beeruk* disapproved of the dictum in *Fahringer, surpa.* and overruled all the cases upon which that Court had relied which had concluded that damages in such cases are to be determined upon the value of services rendered. Rather, the *Beeruk* Court concluded that because the uncle breached the contract with his nephew — or put another way — the nephew was prevented from completing his end of the bargain — the nephew's status is elevated to that of a creditor of the estate. The nephew was entitled to enforce his right to the entire amount promised him by contract. As a creditor, his rights were superior to that of the surviving spouse thereby entitling him to the entire estate of the decedent.

Based upon the foregoing, this Court concludes that a valid and enforceable agreement between John Sr. and Jane exists; as Jane was forced to leave the farm and cease working for her father, she did not breach the contract, therefore, she is entitled to enforce the agreement in accordance with *McCahan's Estate, supra.*; and in light of the *Estate of Beeruk, supra.*, Jane's status is elevated to that of a creditor of her father's estate and she is entitled to a sum equal in

19

value to the value of the entire farm, less the excluded animals and equipment, as identified in the 1991 deed of trust.

BY THE COURT:

LOIS E. MURPHY, J.

Copies of the above mailed

March 23, 2015, to:
Thomas Boulden, Esquire
Robert G. Bricker, Esquire

20